**DELTA AIR LINES, INC.**

v.

**AIRLINE PILOTS ASSOCIATION.**

Civ. No. C87–239.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 1987.

---

Paul David Jones, Jefferson D. Kirby, III of Ford & Harrison, Robert S. Harkey, Gregory L. Riggs, Delta Air Lines, Inc., Atlanta, Ga., for plaintiff and counter-defendant.

James Michael Walls, Office of James Michael Walls, Atlanta, Ga., for defendant and counter claimant.

## ORDER

ORINDA D. EVANS, District Judge.

This action seeking to overturn an arbitration award handed down pursuant to the provisions of the Railway Labor Act ("RLA") is before the court on cross motions for summary judgment.

This case concerns the discharge of William D. Day, a former Delta pilot, who was discharged by Delta for operating an aircraft while intoxicated. The facts underlying both parties' motions for summary judgment were established at Mr. Day's grievance hearing before the Delta System Board of Adjustment, ("the Board"), and are unchallenged.

On January 9, 1985, William D. Day served as the Pilot-in-Command of a flight which arrived in Bangor, Maine around 2:00 p.m. He and the crew were scheduled to lay over in Bangor for the night then fly Delta Flight No. 437 from Bangor to Boston at 7:05 a.m. the next morning.

During that lay over, Day drank unknown quantities of scotch whiskey, as well as wine and beer, and became extremely intoxicated. At his hearing, Day indicated that he did not have a clear idea of how much alcohol he drank. He stated that he could not remember anything that happened after about 10:00 p.m.

The next morning Day was unable to get out of bed in time to leave for the airport with the rest of the crew. He arrived at the airport just prior to the scheduled departure. Witnesses indicated that another member of the cockpit crew, first officer David Rothbart, had to assist him on board the aircraft. At least one passenger and two flight attendants indicated their concern about Day's condition. His eyes were glazed, his face was red and swollen, and he smelled strongly of alcohol. One flight attendant knocked on the locked cockpit door to voice her objections to having a drunk fly the plane. The second officer, Peter Voorhees, opened the door slightly, and simply responded that everything was fine.

After takeoff, the second officer left the cockpit to get some coffee. One of the flight attendants told Voorhees that she knew the captain was drunk and that she hated him for putting the flight attendants in that position. Upon returning to the cockpit the second officer passed a note to the first officer stating, "We got trouble with the F/A's." Immediately thereafter, the cockpit voice recorder was deliberately disconnected, in direct violation of FAA regulations, while the crew discussed what to do about the flight attendants' concerns regarding Day's condition.

On arriving in Boston, one of the passengers contacted a Delta customer service supervisor and declared that the captain of the aircraft was intoxicated. The flight attendants went directly to Captain James Baker, Delta's chief pilot in Boston, and reported that Captain Day was drunk.

Realizing the seriousness of these accusations, Captain Baker met with Day in his office. He indicated that Day was moving slowly, that his speech was slurred, and that he looked drunk. Baker ordered Day and the first and second officers to submit to a blood alcohol test. The test results of the first and second officers were both negative. Captain Day's test indicated an alcohol content of .065 milligrams. Expert analysis indicated that given time for the alcohol to dissipate, at the time that Captain piloted Flight 437 from Bangor to Boston he had a blood alcohol content of around .13 grams.[1]

Under the Delta Flight Operations Procedures Manual,

Use of intoxicating beverages, including wines and beer, by flight crew members while in uniform or within 24 hours prior to departure of a flight is prohibited. The excessive use of intoxicants or drugs by any flight crew member, regardless of the above limitations, constitutes cause for discharge.

Any evidence of the use of alcohol or other drugs which is apparent at the time of reporting for flight duty, also constitutes reason for discharge.

Federal aviation regulations specify that:

No person may act as a crew member of a civil aircraft—

1. Within eight hours after the consumption of any alcoholic beverage

2. While under the influence of alcohol;

3. While using any drug that affects the person's faculties in any way contrary to safety; or

4. While having .04% by weight or more alcohol in the blood

Having clearly violated these rules by acting as pilot in command of a flight while drunk, Captain Day was terminated by Delta on January 15, 1985. The parties agree that Delta had no reason to know about Day's drinking problem before the incident occurred, and that he did not inform Delta that he thought he was an alcoholic until after his discharge. Nor did Captain Day ask to be enrolled in Delta's alcohol rehabilitation program prior to his discharge.

Day subsequently filed a grievance against Delta, which was denied. The Airline Pilots Association then requested arbitration, and the System Board of Adjustment was convened pursuant to the Airline Pilots' collective bargaining agreement with Delta.

In an opinion issued in January, 1987, the System Board determined that:

[Day] ingested a considerable quantity of alcohol (beer, wine and Scotch Whiskey) in violation of the Company's (then) 24–hour rule and the FAA's 8–hour rule. He reported for Flight 437 on January 10, 1985, under the influence of alcohol and flew this Bangor–Boston trip as captain despite his impaired condition. A blood alcohol test administered to [Day] at 11:33 a.m. on January 10, 1985, indicated approximately 0.13 grams percent alcohol (well above the usual d.u.i. standard of 0.10) when grievant commenced flight 437 at about 7:05 a.m. that morning.

System Board Opinion, p. 27.

In a three-to-two opinion, a majority of the System Board found that, although Day had committed a dischargeable offense, he should have been offered the option of entering the Delta alcohol rehabilitation program instead of being terminated. The Board determined that Delta, by firing Captain Day, did not administer its alcohol rehabilitation program uniformly or fairly. This conclusion was based on the fact that, on at least three prior occasions, crew members who attempted to report for duty while intoxicated were intercepted by fellow crew members or other Delta employees before take off. Rather than be discharged, they were either given the op-

---

1. In Georgia, .1 gram is presumptive of operating an automobile under the influence of alcohol.

portunity to enter Delta's alcohol rehabilitation program and/or given punishment less severe than discharge. Further, the Board's decision turned on its finding that although under Delta's Operations Manual crew members who allowed fellow crew members to operate air craft while under the influence of alcohol were "equally guilty," the first and second officers in this case were suspended and not discharged. The System Board's opinion reasoned:

> Nothing in the record indicates that the Company has advised its pilot group that a pilot who reports for work under the influence of alcohol but who is intercepted before he gets to the plane will probably not be discharged, but that if this pilot enters the plane his discharge will be automatic. The [Flight Operations Manual] says only that *reporting* for flight duty under the influence is cause for discharge.
>
> The Company, in other words, has not effectively implemented the policy it claims to have designed to encourage interception [of crew members under the influence] in the interest of flight safety.
>
> \*   \*   \*   \*   \*   \*
>
> The troublesome element model in this case is that under the Company's scenario grievant should have been intercepted, and the fact that he was not intercepted was not grievant's fault but that of his fellow crewmembers. Moreover, as noted above, the Company, by having failed to communicate effectively its real interception policy, must share in the responsibility for the non-interception.

System Board Opinion at 32–33.

In its award, the Board concluded that the discharge of Captain William D. Day was "without just cause although [Day] did commit serious misconduct." Captain Day was awarded reinstatement, without back pay or related benefits, and Delta was ordered to pay for the costs of the alcohol rehabilitation program in which Day had privately enrolled several months after his termination with Delta. Further, Delta was directed to cooperate with Day and with the Federal Aviation Administration to allow Day to receive a first-class airman medical certificate.

The scope of judicial review over arbitration awards is extremely narrow. "Substantive review of an award is limited to a determination of whether an award is irrational, whether it fails to draw its essence from the collective bargaining agreement, or whether it exceeds the scope of the arbitrator's authority." *Butterkrust Bakeries v. Bakery, Confectionery and Tobacco Workers International Union*, 726 F.2d 698, 699 (11th Cir.1984). In addition, a court may overturn an arbitration award where the award is contrary to a well-defined and definite public policy. *W.R. Grace v. Local Union 759, International Union of United Rubber, Cork, Linoleum and Plastic Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). Delta argues that the arbitration award in this case must be set aside because the Systems Board exceeded its authority, and because the award violates a clearly defined public policy against allowing pilots to fly while intoxicated.

With respect to the first argument, Delta maintains that the Board acted outside its authority by fashioning a remedy which interfered with Delta's ability to carry out its statutory obligation to provide "the highest possible degree of safety in the public interest." 49 U.S.C. § 1421(b). Delta contends that federal law, including FAA regulations, place upon the company the exclusive authority to assess a pilot's abilities, giving full consideration to "personal characteristics that could adversely affect safety." 14 C.F.R. § 121.413(4)(ii). The evidence produced at the hearing indicated that Day had at least two prior drinking episodes during which he suffered complete blackouts or loss of memory. The second of these incidents occurred less than a month prior to the blackout he suffered before piloting Delta flight 437.

Delta contends that Day's voluntary decision to begin drinking shortly before he was to act as pilot in command of a passenger flight evidences a deficiency in judgment and a willingness to endanger the lives of hundreds of passengers. It contends that an air carrier's decision as to such safety factors as pilot judgment may not be usurped by the Systems Board.

In support of its position, Delta cites *World Airways, Inc. v. International Brotherhood of Teamsters*, 578 F.2d 800 (9th Cir.1978). In that case, the arbitration award reinstated a pilot whom the air carrier believed lacked the sound judgment necessary to operate an air craft. The pilot had been discharged after a series of incidents, including flying a plane with *too* little fuel, and missing approaches at at least three different airports. The arbitration board ordered his restatement, notwithstanding testimony indicating that increased training would enhance his technical capabilities but not ameliorate his poor judgment.

The Ninth Circuit Court of Appeals overturned the award, explaining that although there was a strong policy in favor of allowing disputes to be arbitrated, an equally strong federal policy gave carriers the responsibility for determining whether a given pilot has the capacity to operate an air craft safely. The Court found that, "It was the duty of the carrier to determine the competency of its pilots in the interest of public safety taking into account such things as 'personal characteristics that could adversely affect safety.'" 578 F.2d at 803, quoting 14 C.F.R. § 121.413(4)(ii).

However, the scope of this decision was restricted in a later case when the Ninth Circuit held that the decision in *World Airways* did not exclude air passenger safety issues from arbitration. The Court explained that it was not the consideration of a safety-related issue that exceeded the appropriate scope of an arbitrator's authority; rather, the remedy in *World Airways* went beyond the arbitrator's authority because evidence in the record indicated that the pilot's judgmental errors were not correctable. *Association of Professional Flight Attendants v. American Airlines*, 767 F.2d 1331, 1334 (9th Cir.1985).

Under the collective bargaining agreement at issue here, the System Board's jurisdiction is extremely broad. The Board may consider "disputes between any pilot covered by this Agreement and the Company growing out of grievances or out of interpretation or application of any of the terms of this Agreement."[2] Nor does the agreement list specific reasons for discharge. Thus, the safety-related issue presented by Day's discharge was properly before the Board so long as the remedy did not violate the agreement or public policy. *See Northwest Airlines v. Air Line Pilots Ass'n Int.*, 808 F.2d 76 (D.C.Cir.1987), *pet. for cert. pending.*

This court reads *World Airways* to stand for the proposition that an arbitration award cannot put an air carrier in the position of violating its duty to ensure air safety. *Flight Attendants* makes clear that the earlier case did not really involve an arbitration award going beyond the arbitrator's authority. Rather, the true rationale underlying *World Airways* was that it is contrary to public policy to allow a pilot to fly when his judgment is irreparably impaired.

Thus *World Airways* can be seen to support Delta's second argument, that being that the arbitrator's award violates public policy. In order for an arbitrator's award to be overturned as a violation of public policy, the policy must be "well-defined and dominant." *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183. The public policy at issue may be ascertained by "reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id*, quoting *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945).

It seems that two different interpretations of the public policy doctrine have developed among the circuits. The Elev-

**2.** Delta also argues that the Board acted outside its authority by evaluating Day's dismissal in light of Delta's alcohol rehabilitation program. Delta claims that because the program is not mentioned in the collective bargaining agreement, the Board may not consider it. However, this argument ignores the language of the agreement, which gives the Systems Board jurisdiction over disputes stemming from "grievances or out of an interpretation of application" of the collective bargaining agreement. [Emphasis supplied]. The term "grievances" is not limited by any language in the contract. Given this sweeping language, the arbitrators were authorized to consider Delta's alcohol rehabilitation program in connection with Day's discharge. *Cf. Loveless v. Eastern Air Lines*, 681 F.2d 1272 (11th Cir.1982).

enth Circuit has not yet delineated the scope of the doctrine, other than to acknowledge its existence. *See e.g., Shopmen's Local 539 v. Mosher Steel Co.,* 796 F.2d 1361 (11th Cir.1986), and *Drummond Coal v. United Mine Workers of America, District 20,* 748 F.2d 1495 (11th Cir.1984). The First, Fifth and Seventh Circuits have held that where the worker's conduct constituted a blatant violation of a clearly defined public policy that reinstatement is inappropriate. The D.C. Circuit has recently promulgated a much narrower view of the public policy doctrine, holding that the act of reinstating a discharged worker must somehow violate a specific policy.

An examination of the relevant case law makes this distinction clear. In *United States Postal Service v. American Postal Workers Union,* 736 F.2d 822 (1st Cir. 1984), a postal worker embezzled funds from the post office during his employment. The arbitration board, finding that certain mitigating circumstances existed, ordered that he be reinstated without back pay. The post office sued to overturn the award on grounds that reinstatement would violate public policy. The union argued that because there was not a specific public policy against the reinstatement of embezzlers, that the award did not violate public policy.

The First Circuit held that the public policy doctrine was not as narrow as the union claimed. Although in at least one prior case reinstatement itself violated a federal law,[3] the Court did not require such a close nexus between the award and a specific public policy in all cases. Rather, the court determined that reinstatement of a worker who had embezzled funds from the post office would serve to encourage embezzling and undermine the government's ability to enforce the public policy against embezzling. The Court explained:

> Aside from any considerations bearing directly on Cote [the dismissed employee] we cannot avoid the common sense implications that requiring the rehiring of Cote would have on other postal employees and on the public in general. Other postal employees may feel there is less reason for them to be honest than they believed—the Union could always fix it if they were caught. Moreover, the public trust in the Postal Service, and in the entire federal government, could be diminished by the idea that graft is condoned.

736 F.2d at 825.

Similarly, in *S.D. Warren Company v. United Paperworkers International Union,* 815 F.2d 178 (1st Cir.1987), the Court declined to enforce an arbitration award which required the reinstatement of two employees who had been fired for using or possessing illegal drugs on company property. The Court once again noted that in order to invoke the public policy exception the court need not point to some positive rule of law declaring that reinstatement of an employee fired for possession of drugs is illegal. Rather, the Court found that the reinstatement of employees who had clearly violated not only company policy but public law by possessing illegal narcotics was sufficiently in violation of public policy to warrant overturning the arbitrator's decision. The Court was particularly concerned with the issue of work place safety, because the employees worked around heavy machinery, and doing so under the influence of drugs could jeopardize the safety of their co-workers.[4]

---

**3.** In *American Postal Workers v. United Postal Service,* 682 F.2d 1280 (9th Cir.1982), a postal worker engaged in an unauthorized strike. The arbitration board ordered the worker reinstated. His reinstatement explicitly violated 5 U.S.C. § 7311, which stated that individuals who participated in strikes against the United States government may not hold a position with the government. On this basis, the Ninth Circuit declined to enforce the arbitrator's award.

**4.** The Court also held that the decision was outside the scope of the arbitrator's authority because the unambiguous wording of the collective bargaining agreement said that where drugs are implicated an employee may be fired. Thus, once the arbitrators determined that the employees had actually used or possessed drugs on company property, they did not have the authority to consider mitigating circumstances in deciding whether the employees should have been discharged. Here, the arbitrators' authority was not so constrained.

The Fifth Circuit has applied the public policy doctrine in the same manner. In *Amalgamated Meat Cutters v. Great Western Food Company*, 712 F.2d 122 (5th Cir.1983), the Court considered the case of a discharged employee who had wrecked the company's tractor-trailer rig while under the influence of alcohol. The arbitrator ordered the employee reinstated on grounds that Great Western failed to investigate the accident thoroughly, although the employee did admit to drinking shortly before the accident. The Court noted that drinking within four hours of operating a motor vehicle or operating a motor vehicle under the influence of alcohol violated federal motor carrier safety regulations. The Court determined:

> Thus, the public policy of preventing people from drinking and driving is embodied in the case law, the applicable regulations, statutory law, and pure common sense. The policy is "well defined and dominant." *W.R. Grace and Company*, [461] U.S. at [766], 103 S.Ct. at 2183. To enforce the arbitrator's award in this case, an award which compels the reinstatement to driving duties of a truck driver who admittedly drank while on duty, would violate this public policy. Therefore, the district court erred in enforcing the award.

712 F.2d at 125.

The Fifth Circuit again considered the public policy doctrine in *Misco, Inc. v. United Paper Workers International Union*, 768 F.2d 739 (5th Cir.1985), *cert. granted*, —— U.S. ——, 107 S.Ct. 871, 93 L.Ed.2d 826 (1987). In that case, the arbitrator ordered reinstatement of an employee found to be in violation of the company's prohibition against possession of drugs on company property because the arbitrator did not consider the presence of marijuana in the employee's car to be a significant violation. The Fifth Circuit disallowed enforcement of the arbitration award, noting that use or possession of drugs, especially in the work place, was contrary to public policy and that enforcement of the award could encourage other workers to engage in illegal and potentially dangerous conduct.

The Seventh Circuit has also construed the public policy exception in a manner consistent with the First and Fifth Circuits' approach. In *E.I. DuPont de Nemours v. Grasselli Employees Association*, 790 F.2d 611 (7th Cir.1986), the Seventh Circuit noted that in reviewing an award a reviewing court must respect the arbitrator's finding of facts but that the judgment of whether the award violates public policy is a *de novo* one for the court. The Court explained that the arbitration award need not, by itself, violate a positive rule of law. Rather, the enforcement of the award must have the effect of violating a clearly defined public policy. *See also International Union of United Auto Workers v. Keystone Consolidated Industries*, 782 F.2d 1400 (7th Cir.1986) (arbitrator's award vacated where enforcement would violate clearly defined public policy behind the enactment of ERISA).

The D.C. Circuit stands alone in giving a limited interpretation to the public policy exception. In *Northwest Airlines*, 808 F.2d at 76, the first officer was terminated for flying an aircraft while intoxicated. The system board determined that in light of the employee's alcoholism, subsequent rehabilitation, and other mitigating factors, the discharge should be reduced to a suspension without back pay with reinstatement dependent upon his unconditional recertification by the FAA. The district court overturned the award on grounds that it violated public policy. The Court of Appeals for the District of Columbia reversed, holding that in order for an award to contravene public policy the act of reinstatement must itself violate some positive rule of law. The Court found that there was no FAA regulation or other rule forbidding the reinstatement of alcoholic pilots who have undergone rehabilitation. Thus, the court found that public policy exception inapplicable.

The contrast between the two approaches is clearly illustrated by the D.C. Circuit's treatment of a postal worker dismissed for embezzling. In *American Postal Workers v. United States Postal Service*, 789 F.2d 1 (D.C.Cir.1986), the arbitrator reinstated an employee who had admit-

ted to dishonesty in postal service transactions because he found that the postal worker should have been given Miranda warnings before being questioned about his illegal embezzlement of post office funds. The postal service sought to overturn the award as violative of public policy, as the First Circuit did when it dealt with a similar fact situation.[5] The D.C. Circuit found that, "the arbitrator's award was not itself unlawful, for there is no legal prescription against the restatement of a person such as the grievant. And the award did not otherwise have the effect of mandating any illegal conduct." 789 F.2d at 8. Thus the court found public policy exception inapplicable.

Although the Eleventh Circuit has not had the occasion to analyze the public policy exception in detail, the former Fifth Circuit did apply it in at least one case, that being *National Labor Relations Board v. Dixie Motor Coach Corp.*, 128 F.2d 201, 203 (5th Cir.1942). In that case, the former Fifth Circuit denied enforcement of an NLRB award order reinstating a bus driver who had been discharged for drinking while on duty.[6] In light of this former Fifth Circuit decision, this court finds that the correct approach is the majority position outlined above, and declines Defendant's invitation to follow the D.C. Circuit in its narrow construction of the public policy doctrine.[7]

After carefully examining the facts of this case as well as the above legal precedents, the court finds that enforcement of this award would violate clearly established public policy against allowing the pilots of airliners to operate aircraft under the influence of alcohol. That policy is "well defined and dominant" and codified in FAA regulations. The public safety implications of a situation such as the one

that occurred when Captain Day piloted Delta Flight 437 are enormous. While in some sense it may be "unfair" that Captain Day was fired while other pilots who were intercepted before flying were allowed to try to rehabilitate before being discharged, Delta is perfectly correct in arguing that failure to discharge in this case could render ineffective the only real deterrent that an airline carrier can use to try and prevent its employees from operating aircraft under the influence of alcohol.

In fact, Delta indicated that this is the only time in Delta's history, to its knowledge, that an aircraft was actually flown by an intoxicated pilot. While in some sense it may not be Captain Day's "fault" that he flew the airplane while drunk, he did so, and allowing his reinstatement would give other aircraft pilots the message that, when they get into that kind of trouble, "the union could always fix it." *Postal Services*, 736 F.2d at 825. The court cannot imagine a more egregious violation of the public policy against allowing pilots to fly while intoxicated.[8]

The court is not suggesting that an airline pilot may not be reinstated under different circumstances, or that a discharged pilot cannot be rehabilitated and hired by another airline. However, the arbitrators in this case were not authorized to decide whether, having been rehabilitated, Captain Day should be rehired. *See Butterkrust Bakeries*, 726 F.2d at 698 (remedial events occurring after termination are not to be taken into account as mitigating a dischargeable offense). Rather, the arbitrators' decision was limited to whether or not Delta was justified in discharging Day *at the time*, after he had flown an airplane while drunk, and before he had given the airline any indication that he was an alcoholic. The fact that Captain Day sought

---

**5.** *See United States Postal Service v. American Postal Workers Union*, 736 F.2d 822 (1st Cir. 1984), discussed above.

**6.** Under *Bonner v. The City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir.1981), former Fifth Circuit precedent is binding upon this court.

**7.** Even in the absence of binding precedent, the court would follow the majority approach as the better-reasoned position.

**8.** The negative impact of the System Board's decision is exacerbated by the fact that the arbitrators' award may be interpreted to mean that every Delta pilot must be given the opportunity to go into alcohol rehabilitation before being discharged, thus giving each pilot the opportunity to fly an airplane drunk *at least once* before being discharged.

treatment for alcoholism after his discharge, and subsequently controlled his drinking, is quite simply irrelevant to the public policy implications of this case.[9]

■ Finally, Delta argues that requiring Delta to pay the costs of the private alcohol rehabilitation treatment which Captain Day sought after his discharge amounts to punitive damages, and is beyond the scope of the arbitrator's authority. The court agrees with Defendant that these damages are compensatory, not punitive, and therefore permissible. However, the court cannot find any allowable reason to overturn the arbitrators' award. As noted previously, the Board has jurisdiction over all grievances arising between Delta pilots and the company. See note 2, *supra.* This includes any grievance Day may have with respect to his entitlement to enroll in Delta's alcohol rehabilitation program. While it is true that Day did not assert a right to such treatment until well after his discharge, Day made the claim the subject of his grievance and the question was therefore properly before the Systems Board.

No matter how strongly this court may disagree with the factual findings [10] or conclusions of the Board, it does not have jurisdiction to overturn the arbitrators' decision unless the award fails to pass scrutiny on one of the four grounds enumerated above. Requiring Delta to reimburse Day for the costs of his private therapy does not exceed the arbitrators' authority, given their factual conclusions regarding his entitlement to treatment in Delta's program. Given the sweeping scope of the Board's jurisdiction under the Agreement, the court cannot say that the award fails to draw its essence from the Agreement. It is not irrational, and no corruption has been alleged.

With respect to the public policy considerations, the court finds that requiring Delta to cooperate with Day and the FAA in recertifying Day is violative of public policy, for the same reasons his reinstatement is unsupportable. However, the court cannot say that, as a matter of law, allowing Day to be treated for alcoholism violates public policy. Thus this portion of the award must be upheld.

In sum, Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part. Defendant's cross motion for summary judgment is GRANTED in part and DENIED in part. The court vacates the Systems Board's award insofar as it requires reinstatement of Captain Day, or that Delta cooperate in getting Day recertified. Delta is ordered to pay the money damages awarded to Day by the Board. The clerk is directed to enter final judgment based upon this order. Plaintiff's request for oral argument is DENIED.

9. In fact, Defendant has informed the court that Captain Day, having successfully undergone treatment, is currently working for another airline.

10. It seems inconceivable that Day should be entitled to participate in Delta's alcohol rehabilitation program when he did not make such a request until after his discharge, but such were the findings of the Systems Board, and this court has no authority to second-guess them.