73757. SMITH v. CITY OF EAST POINT et al.
(359 SE2d 692)

McMURRAY, Presiding Judge.

In early 1985, the Police Department of the City of East Point received reports that some of its officers were smoking marijuana in public. The chief of police was unable to find the offending officers through conventional investigative means. Accordingly, it was determined that urinalysis would be employed to ascertain the offending officers. In order to conduct the urinalysis "in a nonselective manner," the chief of police and the city manager decided to give the tests to all employees of the city having police power.

Appellant Smith was a captain in the city's fire department. He

was employed by the city as a fireman for 21 years. Smith was assigned the duties of fire inspector and, in that capacity, he was given police power. Thus, Smith was required to submit to urinalysis.

On March 3, 1985, with the assistant chief of police observing him, Smith provided a urine specimen. Three tests were performed on Smith's urine: a radio immunoassay test, an enzyme immunoassay test, and a gas chromatograph mass spectrometer test. The results of the first two tests were inconclusive. (The results were negative but highly suggestive of marijuana use.) The third test came back positive. In short order, Smith was discharged for "conduct unbecoming to his position in that, while employed as a police officer with the City of East Point, he did use a controlled substance identified as THC (marijuana)."

Denying the charges against him, Smith appealed to the city's personnel board. He asserted, inter alia, that the urinalysis constituted an unreasonable search and seizure and violated his rights under the federal and state constitutions. The personnel board determined that Smith's constitutional rights were not abridged. It sustained the charges against him and decided he had been discharged properly. Smith sought a writ of certiorari in the superior court. Again Smith asserted the violation of his constitutional rights. The superior court denied Smith's petition and we granted a discretionary appeal. *Held*:

1. On appeal, Smith presents argument in support of his state constitutional claim only. Although Smith insists that he is not waiving his Fourth Amendment rights, no argument is made in support of those rights. Inasmuch as Smith no longer addresses his federal constitutional claim, it must be considered abandoned. *Taylor v. State*, 177 Ga. App. 624, 628 (3) (340 SE2d 263).

As a practical matter, the abandonment of the Fourth Amendment claim is insignificant. After all, "Georgia has long granted more protection to its citizens than has the United States . . ." *Creamer v. State*, 229 Ga. 511, 515 (192 SE2d 350). And, although Georgia cannot provide less protection for its citizenry, it can provide more. Id. Furthermore, Art. I, Sec. I, Par. XIII of the 1983 Constitution of Georgia is nearly identical to the Fourth Amendment. *Smoot v. State*, 160 Ga. 744, 747 (128 SE 909). Thus, even though Smith makes no Fourth Amendment argument, Fourth Amendment cases will serve us well as signposts.

2. Art. I, Sec. I, Par. XIII of the 1983 Constitution of Georgia reads: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause supported by oath or affirmation particularly describing the place or places to be searched and the persons or things to be seized."

Plainly, this provision of the Georgia Constitution prohibits unreasonable searches and seizures. Was the "taking" of Smith's urine an unreasonable search and seizure within the meaning of the Georgia Constitution? To answer this question, we must first decide whether a urinalysis constitutes a search and seizure. We think that it does.

"Urine, unlike blood, is routinely discharged from the body, so no governmental intrusion into the body is required to seize [it]. However, urine is discharged and disposed of under circumstances where the person certainly has a reasonable and legitimate expectation of privacy. One does not reasonably expect to discharge urine under circumstances making it available to others to collect and analyze in order to discover the personal physiological secrets it holds, except as part of a medical examination. It is significant that both blood and urine can be analyzed in a medical laboratory to discover numerous physiological facts about the person from whom it came, including but hardly limited to recent ingestion of alcohol or drugs. One clearly has a reasonable and legitimate expectation of privacy in such personal information contained in his body fluids. Therefore, governmental taking of a urine specimen is a seizure within the meaning of the Fourth Amendment. *Allen v. City of Marietta*, 601 FSupp. 482, 488-89 (N.D.Ga. 1985); *Storms v. Coughlin*, 600 FSupp. 1214, 1217-18 (S.D.N.Y. 1984); *Murray v. Haldeman*, 16 M.J. 74, 81 (C.M.A. 1983)." *McDonell v. Hunter*, 612 FSupp. 1122, 1127 (S.D. Iowa 1985). Accord *Capua v. City of Plainfield*, 643 FSupp. 1507, 1513 (D.N.J. 1986); *Lovvorn v. City of Chattanooga*, 647 FSupp. 875, 879 (E.D. Tenn. 1986).

Having decided that the urinalysis was a search and seizure, we must now determine whether it was reasonable. In search and seizure cases, reasonableness cannot be defined with precision. Each case requires the balancing of the public's interest against the rights of the individual to be free from governmental intrusion.

Undoubtedly, the city has a compelling interest in keeping its police force away from drugs. The integrity and well-being of the department depend upon it. Thus, it is entirely proper for the city to take reasonable efforts to weed drug abusers out of law enforcement agencies. Balanced against this interest, we must weigh Smith's personal rights. In doing so, we must decide whether Smith reasonably and legitimately had an expectation of privacy in the act of urination.

The courts which have considered this question have determined that most people, including policemen and firefighters, have a reasonable and legitimate expectation of privacy in this regard. See, e.g., *Capua v. City of Plainfield*, 643 FSupp. 1507, 1514, supra; *Lovvorn v. City of Chattanooga*, 647 FSupp. 875, 880, supra. We agree with this assessment. True, policemen and firemen have diminished expectations of privacy when compared to the general public. *Lovvorn v. City*

*of Chattanooga,* supra. (After all, "by the very nature of their job, police should anticipate that their employer would have serious concerns that their ability to discharge their duties be not impaired by drugs and should anticipate that the employer may place reasonable conditions on employment including scrutiny for drug use." *Caruso v. Ward,* 506 NYS2d 789, 793 (Sup. 1986).) But this is not to say that police officers and firemen lose their constitutional rights when they put on their uniforms. *McDonell v. Hunter,* 612 FSupp. 1122, 1128, supra; *Caruso v. Ward,* supra. Policemen and firefighters do have a substantial right to be free from unreasonable searches and seizures.

Thus, although urine tests for police officers and firemen can be conducted in the absence of *probable cause,* a standard must be met before random urinalysis is imposed. Invariably, this standard is defined as a *reasonable suspicion:* "All courts which have ruled upon the validity of urine tests for public employees, including police officers and firemen, have required as a prerequisite some articulable basis for suspecting that the employee was using illegal drugs, usually framed as 'reasonable suspicion.' *Capua v. City of Plainfield,* 643 FSupp. 1507, 1524 (D.N.J. 1986) (fire fighters); *City of Palm Bay v. Bauman,* 475 S2d 1322 (Fla. App. 5 Dist. 1985) (police officers and fire fighters); *Turner v. Fraternal Order of Police,* 500 A2d 1005 (D.C. App. 1985) (police officers); *McDonell v. Hunter,* 612 FSupp. 1122 (S.D. Iowa 1985) (correctional officers); *Allen v. City of Marietta,* 601 FSupp. 482 (N.D. Ga. 1985) (employees of City Board of Lights and Water working around high voltage electric wires); *Patchogue-Medford Congress of Teachers v. Board of Education,* 505 NYS2d 888 (N.Y. App. Div. 1986) (teachers); *Jones v. McKenzie,* 628 FSupp. 1500 (D.C.C. 1986) (school bus drivers); *Caruso v. Ward,* 506 NYS2d 789 (N.Y. Sup. Ct. 1986) (police officers in special organized crime control bureau)." *Lovvorn v. City of Chattanooga,* 647 FSupp. 875, 881, supra.

We can find no facts demonstrating that the city had a *reasonable suspicion* to believe Smith was using controlled substances. To the contrary, the city candidly admits that it tested *all* policemen and firemen having police power "in a nonselective manner." Thus, the taking of Smith's urine was a clear violation of his right to be free from unreasonable searches and seizures.

Inasmuch as Smith's constitutional rights were violated by the unreasonable search and seizure of his urine, we find that the city discharged Smith without just cause. *Capua v. City of Plainfield,* 643 FSupp. 1507, 1521-22, supra. Accordingly, the superior court erred in denying the petition for a writ of certiorari.

In passing, we wish to make clear that our ruling is limited to the facts of this case in which a random urinalysis was used without direct or circumstantial evidence that the employee was involved with

drugs. We leave for another day questions concerning the constitutionality of urine tests which are used by governments to screen applicants for employment or as part of routine health examinations.

*Judgment reversed. Sognier, J., concurs in the judgment only. Beasley, J., concurs specially.*

BEASLEY, Judge, concurring specially.

We cannot reach the issue decided by the majority because of a procedural impediment of fundamental significance. The Personnel Board of Appeals which affirmed the termination of the fire inspector/marshal was improperly constituted.

Appellant raised this question of jurisdiction at the earliest opportunity, by motion to dismiss filed with the board after the employee's request for review was set for hearing. The motion, which was based on this and a number of other grounds which are still pressed, was denied by the board and it affirmed the termination, the effective date of which had been held in abeyance until that action had been taken. The question was raised again in the superior court and is pursued here, as one of the grounds upon which appellant rests his sole enumeration of error, that the superior court erred in affirming the board's decision. Even if jurisdiction had not been so diligently challenged, we would have to address it, as the jurisdiction of a body whose acts are challenged may be raised at any time. It is a threshold matter. See *Williams v. Kaylor*, 218 Ga. 576, 581 (129 SE2d 791) (1963).

The board was composed of the mayor, who presided and ruled on all motions, and the senior councilman from each of the four wards, meaning the councilman who had served more of his current term than had any other councilman from that ward. The appellees have admitted that this differs from what was prescribed in the 1972 charter amendment. It calls for five members appointed by the city council, one to be an attorney who shall preside and make all rulings on legal questions, and four to be qualified electors of the city. All are to serve for one year and be compensated as provided in ordinance by the city council. Ga. L. 1972, pp. 2151, 2208, Secs. 140, 141, 143. The authority of the board is found in Section 139. These provisions of the statute were made a part of the city code, sections 4-217 through 4-221.

The saving factor, argues the appellees, is that the charter was amended by law in 1979 to accommodate a 1977 ordinance setting the composition as actually used in this case, the effective date of which ordinance was expressly delayed until the charter was amended.

The problem with this proposition is that the 1979 charter amendment did not change the 1972-specified composition or other features of the board. The ordinance which envisioned a different

board provided: "The repealer (of all other ordinances in conflict) . . . shall not apply to any personnel actions or disciplinary actions that may arise after adoption of this ordinance but before adoption of a home rule charter amendment correcting and clarifying certain portions of the City Charter . . . Any personnel disciplinary action arising between the period of time of adoption of this ordinance and the period of time of adoption of the proposed home rule amendment of the Charter, shall proceed under the provisions and procedures set forth in the City Code as it existed prior to adoption of this ordinance."

The charter amendment in 1979 did not "correct and clarify" the portions of the charter which dealt with the personnel board of appeals, its authority, its membership, its compensation, its secretary, or the conduct of its hearings. These comprised Sections 139 to 143 of the charter. It is true that the 1979 charter amendment stated that one of its purposes was "to authorize and provide for adoption of ordinances and rules and regulations pertaining to the administration of personnel and employees of the City of East Point; . . ." Ga. L. 1979, p. 4803. That it certainly did, setting up two classifications of employees, a department of administrative services, a non-discriminatory hiring policy, and making other employee-related changes.

But nowhere does it change the personnel board authority, composition, jurisdiction, compensation, record-keeping, or conduct of hearings. The legislative act achieves amendment of the charter "by striking the following sections of the East Point City Charter and inserting in lieu thereof new sections as follows: . . ." Ga. L. 1979, p. 4803, Sec. 1. The only reference with respect to appeals from disciplinary action is the substituted Sections 56 and 57 of the Charter. Section 56 provides for an appeal "following the procedures set forth in the personnel rules, regulations and ordinances pertaining to same by filing a written request for a hearing with the time frames and procedures set forth in said rules and regulations." The new Section 57 is simply "Reserved." Ga. L. 1979 at 4808.

These two changes in Sections 56 and 57 of the 1972 act are part of Section 1 of the 1979 act, which starts out by proposing changes in the charter "especially" as amended by acts in 1974, which had amended Sections 56 and 57, and 1965. No mention is made of the 1972 act which provided for the personnel board of appeals. In addition, the title of the 1979 act does not refer to the 1972 act either, even though it expressly identifies other acts it seeks to amend, including the act of 1974 which amended Sections 56 and 57. The point is that nowhere, in either the 1974 act or the 1979 act, were changes made in Sections 139 through 143, nor are they or their subject matter mentioned in the two related sections, that is, Sections 56 and 57. They all simply dovetail.

State legislative control over municipal corporations extends to the amendment of charters. *Spence v. Rowell*, 213 Ga. 145 (97 SE2d 350) (1957). In amending its charter, a municipality must comply with the procedure prescribed by the organic law authorizing such amendment, and construction and validity is tried by the same rules and standards as those applicable to other legislative enactments. Rhyne, Charles S., The Law of Local Government Operations, § 3.6, p. 54. Georgia recognizes that in determining the meaning of ordinances, too, the court must be guided by recognized rules of statutory construction. *Underwood v. Atlanta & West Point R. Co.*, 105 Ga. App. 340, 346 (124 SE2d 758) (1962). That case was modified in *Atlanta & West Point R. Co. v. Underwood*, 218 Ga. 193 (126 SE 785) (1962), but the principle for which it is cited here was applied and reinforced by the Georgia Supreme Court. Id. at 196. An ordinance has the force of law. *Bearden v. City of Madison*, 73 Ga. 184 (1) (1884); *Maner v. Dykes*, 183 Ga. 118, 120 (187 SE 699) (1936). It cannot, of course, supersede an act of the General Assembly. *City of Atlanta v. Myers*, 240 Ga. 261 (240 SE2d 60) (1977).

It is true that a municipal corporation may amend its charter by ordinances, via certain specified methods. OCGA § 36-35-3. Here it elected to do so by anticipating a legislated charter amendment which would, by the terms of the ordinance, give life to the new ordinance. That has not yet been done. Even if the city intended to substitute new provisions regarding the personnel board of review, it clearly did not do so. Repeals by implication are not favored. *Morris v. City Council of Augusta*, 201 Ga. 666, 672 (2) (40 SE2d 710) (1946). Nor is there any repugnancy between the 1972 charter amendment, the 1977 ordinance, and the 1979 charter amendment so as to call into play the "later enactment" rule of construction. *Evans v. Evans*, 242 Ga. 57, 58 (247 SE2d 857) (1978).

Although we must look to the purpose and intent of the legislature and construe the law to implement that intent, *Wilson v. Bd. of Regents*, 246 Ga. 649, 650 (272 SE2d 496) (1980), the intent urged by appellees cannot be wrested from the 1979 charter amendment. For all we know, the ordinance passed in 1977, which looked to future legislation for effectiveness, lost favor in the city by the time the 1979 charter amendment was proposed.

The judgment of the superior court, consequently, should be reversed because of the lack of the board's authority to act, which nullified all of the proceedings before it.

DECIDED JUNE 24, 1987 —
REHEARING DENIED JULY 14, 1987 —

■■■■■■

*Scott Walters, Jr.*, for appellant.
*James A. Eidson, James W. Kytle*, for appellees.