### 44913. CITY OF EAST POINT et al. v. SMITH.
(365 SE2d 432)

BELL, Justice.

We granted certiorari in this case to consider the Court of Appeals' holding that the City of East Point could not require the appellee, a captain in the East Point Fire Department, to submit to urinalysis testing for the purpose of detecting marijuana use, where the city lacked reasonable suspicion that Smith was using marijuana. *Smith v. City of East Point*, 183 Ga. App. 659 (359 SE2d 692) (1987). We reverse.

"In early 1985, the Police Department of the City of East Point received reports that some of its officers were smoking marijuana in public. The chief of police was unable to find the offending officers through conventional investigative means. Accordingly, it was determined that urinalysis would be employed to ascertain the offending officers. In order to conduct the urinalysis 'in a nonselective manner,' the chief of police and the city manager decided to give the tests to all employees of the city having police power.

"Appellant Smith was a captain in the city's fire department. He was employed by the city as a fireman for 21 years. Smith was assigned the duties of fire inspector and, in that capacity, he was given police power. Thus, Smith was required to submit to urinalysis." *Smith*, supra, 183 Ga. App. at 659-660.

Smith, in the presence of the assistant police chief, submitted a urine sample. The city had hired a private lab to perform the urinalysis. The lab used three separate tests to analyze the urine: an enzyme immunoassay, a radio immunoassay, and a gas chromatograph mass spectrometer (hereinafter GC/MS).[1] The first two tests are not as accurate as the GC/MS test. If an employee's test was positive or close to positive under the first two tests, then the GC/MS test was performed. A Dr. McHan, the director of the private lab engaged by the city, testified that the possibility of error using these three tests was conservatively one in 100,000. He said that after the testing the lab maintained custody and control of the results of Smith's tests.

Smith tested negative under the enzyme immunoassay and radio

---

[1] For a discussion of the accuracy of the above tests, see *Nat. Treasury Employees Union v. Von Raab*, 816 F2d 170, 174 (5th Cir. 1987); *Brotherhood of Maintenance v. Burlington Northern*, 802 F2d 1016, 1019 (8th Cir. 1986); and *Nat. Federation of Fed. Employees v. Weinberger*, 640 FSupp. 642, 647-648 (D.C.C. 1986).

immunoassay tests. However, because the results were highly suggestive of marijuana use, the lab ran the GC/MS test. Smith tested positive for marijuana use under it, and he was subsequently discharged from employment.

The Court of Appeals, however, held that Smith's discharge was improper, because the city could not require him to submit to urinalysis without a reasonable, individualized suspicion that he was using marijuana. It is undisputed that the city had no such suspicion of Smith.

1. The sole question for determination is whether the search and seizure[2] of Smith's urine was reasonable within the meaning of Art. I, Sec. I, Par. XIII of the 1983 Georgia Constitution.[3] In determining this question we look to fourth amendment cases for guidance.

"The basic purpose of the fourth amendment . . . is 'to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials,' *Camara v. Municipal Court*, 387 U. S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967) . . . 'The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.' *Bell v. Wolfish*, 441 U. S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979)." *McDonell v. Hunter*, 809 F2d 1302, 1305-1306 (8th Cir. 1987). "The determination of fourth-amendment reasonableness requires consideration of the totality of circumstances in a particular case, weighing all of the factors suggesting constitutional violation against all of those indicating validity." *Nat. Treasury Employees Union v. Von Raab*, 816 F2d 170, 177 (5th Cir. 1987), cert. granted __ U. S. __ (__ SC __, __ LE2d __) (February 29, 1988).

2. In analyzing the reasonableness of the urinalysis, we first examine the invasion of the employee's personal rights. It is clear that the employees have a legitimate expectation of privacy in the wealth of personal information which examination of their urine can disclose. See *Von Raab*, supra, 816 F2d at 175; *Capua v. City of Plainfield*, 643 FSupp. 1507, 1513 (D.N.J. 1986). However, although the privacy invasion is significant enough to implicate the search and seizure provisions of our state constitution and of the fourth amendment, it "is not as intrusive as an invasion of bodily integrity or of the home, nor do

---

[2] The Court of Appeals correctly noted that requiring Smith to submit a urine sample and the testing thereof constituted a search and seizure. *Smith*, supra, 183 Ga. App. at 661.

[3] We decide this case based solely on our state constitution, because Smith has only pursued his state constitutional claim on appeal. See *Smith*, supra, 183 Ga. App. at 660. However, as noted by the Court of Appeals, Smith's failure to pursue a fourth amendment claim is insignificant as a practical matter. Id. at 660.

employees suffer the indignity of either strip or body cavity searches." *Von Raab*, supra, 816 F2d at 177; *McDonell*, supra, 809 F2d at 1308.

3. We next turn to the justification for the urinalysis. To begin, we note that East Point had reports of police officers using marijuana in public, and that, significantly, when East Point learned of this problem, it turned first to conventional investigative means to try to solve the problem. Only when that failed did the city turn to urinalysis.

Moreover, it is clear that the use of marijuana by employees with police powers can seriously undermine the City of East Point's substantial interest in enforcing drug and other laws. An employee's use of marijuana, especially when seen in public, undermines public confidence in the integrity of those employees, and "casts substantial doubt upon [their] ability to carry out [their] duties honestly and vigorously." *Von Raab*, supra, 816 F2d at 178. Most importantly, employees who have the authority to carry weapons endanger their fellow employees and the public when their performance is impaired by use of marijuana or other controlled substances.

We conclude that the reports of marijuana use,[4] the interest the city had in preventing that use, and the fact that the city first attempted to solve the problem by conventional means, demonstrate that the city had a compelling need for the use of urinalysis.

4. We also find that several aspects of East Point's urinalysis program militate toward the conclusion that the testing was constitutionally reasonable.

a. First, the city's program did not vest discretion in any city officials concerning who would be tested: all employees with police powers were required to be tested. If city officials were vested with such discretion, there would be the danger that they could harass certain employees by repeatedly pinpointing them for testing. East Point's program, however, does not suffer from such arbitrariness. See *Von Raab*, supra, 816 F2d at 177; *McDonell*, supra, 809 F2d at 1308.

b. In addition, we note that the record indicates that the lab tested solely for use of marijuana. Urine testing may disclose not only information concerning the use of illicit drugs, but also personal information about the employee which the employer has no justification for knowing, such as whether the employee is taking legal drugs for the treatment of depression or is suffering from diabetes. See *Von Raab*, supra, 816 F2d at 176. Here, because the lab tested solely for

---

[4] We note that Captain Smith does not contend that the reports of marijuana use by police officers were untrustworthy or were a mere subterfuge for the urinalysis. If such contentions were to be made in future cases, courts would have to consider them in determining whether the urinalysis was reasonable.

marijuana use,[5] there is no evidence that the testing was broader than the city's interest would justify.

5. In examining cases from other jurisdictions which have scrutinized the constitutionality under the federal constitution of drug testing programs similar to East Point's, we note that the Fifth Circuit has held such a program reasonable for Customs Service employees desiring to transfer to positions involving the interception of illegal drugs, the carrying of a firearm, or access to sensitive information, *Von Raab*, supra, 816 F2d; that the Third Circuit has held such a program reasonable for the testing of jockeys, *Shoemaker v. Handel*, 795 F2d 1136 (3rd Cir. 1986), cert. denied ___ U. S. ___ (107 SC 577, 93 LE2d 580); and that the Eighth Circuit has held such a program reasonable for corrections officers, *McDonell v. Hunter*, supra, 809 F2d. We believe that East Point's interest in insuring the integrity and safety of employees with police powers is at least as strong as, if not stronger than, the interest involved in insuring the safety and integrity of the horse racing industry, of corrections officers, and of customs officers in sensitive positions.

6. Considering the justification for the city's use of urinalysis, coupled with the protective aspects of the city's urinalysis program, we conclude that the city's urinalysis testing was constitutionally reasonable under the constitution of this state.

*Judgment reversed. All the Justices concur, except, Smith, J., who dissents.*

SMITH, Justice, dissenting.

I agree with the Court of Appeals, Smith's discharge was improper. The City should not have required Smith to submit to a urinalysis test without a reasonable, individualized suspicion that he was using drugs. The City admitted that it had no such suspicion of Smith.

To allow random drug testing of employees who carry arms to enforce the laws because they may endanger fellow employees and the public equates to random testing of all automobile drivers. A person behind the wheel of a car on an expressway poses a danger to more people than an armed policeman does.

DECIDED MARCH 10, 1988 —
RECONSIDERATION DENIED MARCH 30, 1988.

---

[5] We note that although the record discloses that the lab tested only for marijuana use, the record does not show that the city's program contained specific guidelines limiting the tests to that purpose. In the future such specific guidelines would be preferable.

*Eidson & Llewellyn, James A. Eidson, James W. Kytle,* for appellants.

*Scott Walters, Jr.,* for appellee.

*Frank L. Derrickson,* amicus curiae.