## GEORGIA POWER COMPANY, Plaintiff,

v.

## INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 84, an unincorporated association, Defendant.

Civ. A. No. 1:87–CV–2148–JOF.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 10, 1989.

Michael C. Murphy, Jesse P. Schaudies, Jr., Christopher Sheridan Miller Troutman Sanders Lockerman & Ashmore, Atlanta, Ga., for plaintiff.

James Michael Walls, Atlanta, Ga., for defendant.

## ORDER

FORRESTER, District Judge.

This matter is before the court on the parties' cross motions for summary judgment. Fed.R.Civ.P. 56.

## I. PRELIMINARY CONCERNS.

Plaintiff Georgia Power Company's "Complaint Requesting Order Vacating Arbitration Award" was filed September 29, 1987. Pursuant to consent order entered April 21, 1988, the parties were allowed up to and through April 22, 1988 in which to file cross motions for summary judgment. Both motions were filed on this date. Plaintiff's motion was accompanied by the requisite statement of material facts and a supporting brief consisting of over sixty-

five pages. The defendant union's motion was likewise filed in compliance with the Local Rules and was accompanied by a supporting brief consisting of exactly twenty-five pages. The parties' respective responses properly included statements of material fact and were timely filed on or before May 16, 1988. Pursuant to Local Rule 220–1, reply briefs were timely filed on or before May 26, 1988.

Five days after the filing of its reply brief, the defendant union apologetically filed a brief captioned, "Supplemental Reply in Support of the Defendant Union's Motion for Summary Judgment." Similarly, on June 23, 1988, the defendant union filed its "Second Supplemental Brief in Support of Defendant Union's Motion for Summary Judgment." Predictably, plaintiff felt compelled to respond to the defendant union's supplemental briefs and, on June 28, 1988, filed its own supplemental brief. Finally, on July 18 and December 27, 1988 the parties filed their motions for leave to file additional supplemental briefs in connection with their motions for summary judgment.

■ Because the parties' motions for leave to file are unopposed and seek only to call to the court's attention previously unavailable authority relevant to this action, they are GRANTED. The parties' May 31, June 23 and June 28, 1988 briefs are hereby STRICKEN, however, as having been filed without leave of court. Local Rule 220–1. Also filed without leave of court is plaintiff's voluminous brief in support of its motion for summary judgment. The court's case instructions—which are issued as a standing order in each case—require that no brief be filed exceeding twenty-five pages *"unless leave to exceed the limit is granted in advance* (emphasis supplied)." Case Instructions, ¶ 2. As just noted,

plaintiff neither requested nor was granted leave before or after the filing of the brief in question. This fact is particularly troublesome in light of the size of plaintiff's brief[1] and the fact that lead counsel for plaintiff is presently involved in at least one other case before this court[2] and is therefore well aware of the court's pretrial instructions. Under such circumstances the court ordinarily would strike plaintiff's brief without hesitation. Nevertheless, in view of the length of time the parties' cross motions have been pending,[3] and because plaintiff's brief is adequately indexed, the court will *reluctantly* exercise its discretion to waive its page limitation *nunc pro tunc* and will consider plaintiff's brief in passing on the parties' cross motions.

## II. STATEMENT OF FACTS.

■ The parties to this action are plaintiff Georgia Power Company, a public utility and corporation organized and existing under the laws of the State of Georgia, and defendant International Brotherhood of Electrical Workers, Local 84 (hereinafter "the defendant union"), an unincorporated association and labor organization. At all times relevant to this action, the defendant union was engaged in the collective representation of plaintiff's employees. Plaintiff invokes the jurisdiction of the court pursuant to 28 U.S.C. § 1391(c), 9 U.S.C. § 10 and 29 U.S.C. § 185.

Plaintiff and the defendant union are parties to a collective bargaining agreement. Under the terms of this agreement, employees within the collective bargaining unit may be discharged only for "sufficient and reasonable cause" and disciplinary actions against employees are subject to the grievance and arbitration procedures outlined therein. The agreement also provides that all decisions of the arbitrator are final

1. Even had leave been timely sought, the court would have required a special showing before allowing the filing of a brief almost three times the established limit.

2. *Monsky v. Atlanta Braves,* No. 1:87–CV–1308–JOF (NDGa.1987).

3. This action was originally assigned to the undersigned judge September 29, 1987. In May of

1988, however, it was included among the collection of civil cases designated to build the docket of newly-appointed Judge Jack T. Camp. On June 28, 1988, however, the case was reassigned to the undersigned judge. Because of the attending administrative activity, the parties' motions have only recently been resubmitted for consideration.

and binding on the parties. The present dispute arises from an arbitration decision favorable to the defendant union which plaintiff seeks to vacate pursuant to 9 U.S. C. § 10. The defendant union has counterclaimed to compel plaintiff's compliance with the arbitrator's decision and for attorney's fees. *See* 9 U.S.C. § 9. The facts giving rise to this action are as follows.

Warren G. Watson began his employment with plaintiff as a laborer in January of 1975. Until his February 21, 1986 termination for violation of plaintiff's company anti-drug policy, Watson was employed as an auxiliary equipment operator (AEO) at plaintiff's plant in McDonough–Atkinson. As an AEO, Watson's primary responsibility was to ensure that the high pressure equipment in the plant did not overheat and that all valves were in the proper position. Watson's duties included the reading of meters and pressure gauges, the checking of temperatures, bearings pump, and ash handling equipment.

In 1982, plaintiff implemented the aforementioned anti-drug policy thereby making the possession, sale, or use of illegal drugs during working hours or on company property or reporting to work under the influence of illegal drugs dischargeable offenses. In a letter dated November 12, 1984 and mailed to all of plaintiff's employees, plaintiff's chief executive officer restated and clarified the policy, asserting that from that point on, "[T]he unlawful involvement with drugs or narcotics off company property will constitute grounds for severe disciplinary action, up to and including termination of employment." In addition, in October of 1985, plaintiff's plant manager of the McDonough–Atkinson plant issued a statement outlining the plant's procedures for implementing plaintiff's anti-drug policy. By this statement, plant employees were informed that (1) while on plant property, persons, property and automobiles would be subject to search; (2) any employee exhibiting symptoms or characteristics of drug use would be subject to a "fitness for duty" exam which included urinalysis; and (3) if the result of the exam indicated drug use, the employee would be discharged.

In November of 1985, a meeting was held at plaintiff's plant during which all employees of the plant, including Watson, (1) were briefed on plaintiff's anti-drug policy and enforcement procedure; (2) were allowed to review a copy of the enforcement procedures; (3) were informed that narcotics detection dogs would be used on plant property to search for illegal drugs; and (4) witnessed a demonstration of the dog's ability to locate illegal drugs.

On February 20, 1986, a narcotics detection dog was brought to plaintiff's McDonough–Atkinson plant to conduct a search for illegal drugs throughout the plant property, including the employees' parking lot. The search was observed by the dog's handler, as well as by plaintiff's plant manager, assistant plant manager, company security investigator, and plant union steward. During the search of the employees' parking lot, the dog "alerted" on an automobile owned by Watson. Watson was then ordered to report to the parking lot where he was informed of the dog's action and the implications thereof and asked to consent to a search of his automobile.

After securing Watson's consent, plaintiff's company security investigator conducted a search of Watson's automobile which produced a substance later confirmed to be marijuana. On the basis of this discovery and pursuant to plant enforcement procedures, Watson was ordered to undergo a "fitness for duty" exam and urinalysis. Following three separate screenings conducted at an independent laboratory, it was determined that Watson had levels of THC metabolite—the psychoactive ingredient in marijuana—between 300 and 700 nanograms per milliliter, or a minimum of 225 nanograms over the level used by plaintiff to determine a "positive result" under the policy. The laboratory furnished plaintiff with a report indicating drug use within the two weeks prior to the test. In light of these findings and pursuant to the anti-drug policy, Watson was informed by letter dated February 24, 1986 (1) that he had tested positive for marijuana use; (2) that he was thus in violation of the company anti-drug policy;

and (3) that his employment was therefore terminated effective February 21, 1986.

On March 10, 1986, Watson initiated a grievance and appealed his discharge pursuant to the terms of the grievance and arbitration procedures set forth in the collective bargaining agreement and the defendant union. After exhaustion of the grievance procedures, Watson's grievance was finally submitted to arbitration before Arbitrator Ferrin Y. Matthews, and company-appointed and union-appointed arbitrators. Following a February 26, 1987 hearing, Arbitrator Matthews issued his tentative decision and award reinstating Watson without back pay and conditioning continued employment on his passing future drug screenings. After receiving a concurring opinion from the union-appointed arbitrator and a dissenting opinion from the company-appointed arbitrator, Arbitrator Matthews issued his final decision and award September 1, 1987 without modification.

In ordering Watson's reinstatement, the arbitrator made the following findings based on his review of expert testimony and other evidence presented at arbitration: (1) that reasonable and sufficient cause exists for plaintiff to prevent drugs from coming onto its property, and to make inspections through various means in order to prevent such from happening; (2) that the use of the narcotics detection dog by plaintiff was not unreasonable nor without sufficient cause; (3) that based on the dog's alert, plaintiff had reasonable and sufficient cause to believe that drugs were within Watson's vehicle, and therefore had the right to have the vehicle searched, or to discipline Watson for refusing to allow plaintiff to do so; (4) that Watson had sufficient notice of the company's planned use of the narcotics detection dog and by driving his car onto company property consented to having his car sniffed by the dog; (5) that Watson voluntarily consented to the search of his car; (6) that the possession of illegal drugs on company property or the introduction of illegal drugs to the work environment is a direct violation of the company's anti-drug policy; (7) that Watson smoked marijuana the week prior to the drug screening; (8) that Watson had knowledge of plaintiff's policy prohibiting possession of marijuana on company property and knew or should have known that marijuana was present in his automobile when he drove it onto company property; (9) that Watson was a chronic heavy drug user, had smoked marijuana before his discharge, and had smoked three marijuana cigarettes per week over a long period of time; (10) that the chronic use of marijuana is associated with lethargy and inattention, and that such condition would affect Watson's performance if he continued to use marijuana; and (11) that Watson was probably under the influence of marijuana at the time he submitted to urinalysis. Despite these findings, the arbitrator determined that, as applied to Watson, plaintiff's anti-drug policy failed to establish reasonable and sufficient cause within the meaning of the collective bargaining agreement to terminate Watson's employment. Plaintiff seeks to vacate this decision on the grounds that it is contrary to public policy.

## III. CONCLUSIONS OF LAW.

### A. *Scope of Review.*

The judiciary's role in reviewing arbitration awards is extremely limited. In particular, an arbitrator's interpretation of a collective bargaining agreement must be afforded great deference. The Supreme Court has stated,

Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having autho-

rized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.

....

As the Court has said, the arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.

*United Paper Workers International Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987). In addition, the Supreme Court has recognized that as with any contract, "a court may not enforce a collective bargaining agreement that is contrary to public policy." *W.R. Grace and Company v. Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). However,

A court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests (emphasis in original)."

*Misco*, 108 S.Ct. at 373 (quoting *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)). With these standards in mind, the court turns its attention to the parties' cross motions for summary judgment.

B. *Public Policy.*

In considering plaintiff's public policy argument, the court is guided by the case of *Delta Air Lines v. Air Line Pilots Association, International*, 686 F.Supp. 1573 (N.D.Ga.1987) (Evans, J.), *aff'd*, 861 F.2d 665 (11th Cir.1988). *Delta* involved a labor dispute over an airline pilot who was discharged by the plaintiff airline for operating an aircraft while intoxicated. After his condition was reported to the plaintiff by a passenger and flight attendant, the pilot was ordered to submit to a blood-alcohol test. This test revealed a blood alcohol content of approximately .13 grams and established that the pilot had violated both the company policy and federal aviation regulations by operating an aircraft while intoxicated. Following his termination and pursuant to a collective bargaining agreement between the plaintiff and the defendant union, the pilot's grievance was submitted to arbitration. The arbitrator found that the pilot had in fact violated company policy and federal regulations by operating his aircraft while intoxicated, but nevertheless ordered his reinstatement because (1) he had not been afforded an opportunity to participate in the plaintiff's alcohol rehabilitation program, and (2) the crewmen who allowed him to operate the aircraft despite his condition were not also discharged. The plaintiff refused to comply with the arbitrator's decision and instead filed an action to vacate the award.

The matter came before Judge Evans of this district on the parties' cross motions for summary judgment. In vacating the award, Judge Evans noted,

Enforcement of this award would violate clearly established public policy against allowing the pilots of airliners to operate aircraft under the influence of alcohol. That policy is "well defined and dominant" and codified in FAA Regulations. The public safety implications of a situation such as the one that occurred when Captain Day piloted Delta Flight 437 are enormous. .... [F]ailure to discharge in this case could render ineffective the only real deterrent that an airline carrier can use to try and prevent its employees from operating aircraft under the influence of alcohol.

686 F.Supp. at 1580. The defendant union appealed and the Eleventh Circuit affirmed. In so doing, the court declared, "in the case before us, we have the rare example of an award the enforcement of which would violate clearly established public policy...." 861 F.2d at 671. The court

reached this conclusion by distinguishing the case before it from the Supreme Court's *Misco* opinion and another recent Eleventh Circuit case, *Florida Power Corp. v. IBEW*, 847 F.2d 680 (11th Cir. 1988):

> The employee in *Misco* appears to have smoked marijuana in a car in the plant's parking lot. The employee in *Florida Power* was discovered to have drug paraphernalia in his automobile. In these cases, the apparent wrongdoing was serious and is seriously condemned. However, in deciding to commit the wrong, the wrongdoer was not making an employment decision. The employer, on the other hand, may reasonably have disliked furnishing employment to one who is committing such wrongs. Yet, should the employer decide to continue to employ such a wrongdoer, even though his actions are condemned by public policy, *that decision*—to continue employment—is not itself contrary to public policy. Furthermore, the wrongdoing by an employee can be ended without affecting his employment. The wrongdoing in the employment are parallel but not intertwined. The wrongful conduct is wrongful, in and of itself, and its lawfulness *vel non* does not depend in any way on the employment. If public policy is offended—as it seems to have been—the performance of employment duties has nothing to do with it.

*Id.*

The court finds this distinction equally applicable to the instant case. As with the pilot in *Delta*, it is Watson's *employment* which makes his conduct contrary to public policy. *Id.* Moreover, the plaintiff herein, like the employer in *Delta*, could not permit Watson "to continue to perform his employment duties while his offensive conduct continued without being an accessory to the wrongdoing."[4] *Id.* at 671. Thus, the public policy at issue here does not merely address the disfavored conduct in the abstract; rather, the conduct addressed is "conduct which is *integral to the performance of employment duties* (emphasis in original)." *Id.* at 671. In considering the parties' motions, the court is enjoined to ask itself two questions: First, does an established public policy condemn the performance of employment activities in the manner engaged in by the employee? Second, if so, does the arbitrator's decision explicitly conflict with that policy? *Id.* For the reasons more fully set forth below, the court answers both questions in the affirmative.

### 1. Laws and Legal Precedents.

In ordering the reinstatement of Watson, the arbitrator has construed the collective bargaining agreement in such a manner that it appears that plaintiff has agreed to submit to arbitration the question as to whether it should authorize operation of potentially hazardous electrical equipment and machinery by employees while they are under the influence of illegal drugs. The court must therefore ascertain by "reference to the laws and legal precedent" whether there is some explicit public policy that is "well defined and dominant" which would prohibit plaintiff from entering into such a contract. *Id.* (quoting *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183). One inquiry identified by the *Delta* court focuses on "what the people have done on the subject through their elected representatives." *Id.* As noted by plaintiff, the people have done a great deal.

#### (a) Laws.

One elected official through whom the people have acted is the President of the United States. On September 15, 1986, President Reagan signed Executive Order 12564 calling for drug testing of federal employees in sensitive positions and of other employees reasonably suspected of drug use. The Executive Order declares,

---

**4.** In addition to public policy concerns, the legal ramifications of knowingly employing an individual with a history of on-the-job intoxication are substantial. In the event such an employee caused another to be injured or killed because of his intoxication, the employer's exposure could be tremendous. This is particularly so in light of modern trends in tort liability. Courts today have demonstrated that the concept of proximate cause is subject to amazing applications. *See, e.g., Parker v. Williams*, 855 F.2d 763 (11th Cir.1988).

Drug use as having serious adverse effects upon a significant proportion of the national work force and results in billions of dollars of lost productivity each year; the federal government, as an employer, is concerned with the well being of its employees, the successful accomplishment of agency missions, and the need to maintain employee productivity; the federal government, as the largest employer in the nation, can and should show the way towards achieving drug free work places through a program designed to offer drug users a helping hand and, at the same time, demonstrating to drug users and potential drug users that drugs will not be tolerated in the federal work place;

. . . .

The use of illegal drugs, on or off duty, by federal employees is inconsistent not only with the law abiding behavior expected of all citizens, but also with the special trust placed in such employees as servants of the public; federal employees who use illegal drugs, on or off duty, tend to be less productive, less reliable, and prone to greater absenteeism than their fellow employees who do not use illegal drugs; the use of illegal drugs, on or off duty, by federal employees impairs the efficiency of federal departments and agencies, undermines public confidence in them, and makes it more difficult for other employees who do not use illegal drugs to perform their jobs effectively. The use of illegal drugs, on or off duty, by federal employees also can pose a serious health and safety threat to members of the public and to other federal employees; . . . .

Executive Order 12564, 51 Fed.Reg. 32,889 (1986). Pursuant to President Reagan's initiative to create a drug free work place, each federal agency is required to establish a drug testing program for civilian employees. *See, e.g.*, Department of Defense, 52 Fed.Reg. 1340 (1987); Department of Health and Human Services, 53 Fed.Reg. 11, 970 (1988); Department of Transportation, 53 Fed.Reg. 47,002 (1988); Nuclear Regulatory Commission, 53 Fed.Reg. 36,-

795 (1988); Department of Energy, 53 Fed. Reg. 13,752 (1988).

Similarly, the people have acted through their congressmen. For example, in November of 1988, the Drug–Free Workplace Act of 1988 was enacted. This act provides "No person ... shall be considered a responsible source ... for the purposes of being awarded a contract for the procurement of any property or services of a value of $25,000 or more from any federal agency unless such person has certified to the contracting agency that it will provide a drug-free workplace...." To comply with the act, private employers with federal contracts of $25,000 or more must (1) publish a statement notifying their employees that the unlawful manufacture, distribution, dispensation, possession or use of a controlled substance is prohibited in the workplace; (2) notify their employees that their continued employment is conditional upon compliance with the policies outlined in this statement; and (3) establish a drug-free awareness program to inform their employees about the dangers of drug abuse in the workplace. Non-compliance with the act subjects the private employer's federal contract to possible termination or suspension.

In addition, Congress has enacted the Controlled Substances Act as part of the Comprehensive Drug Abuse Prevention and Control Act, Pub.L. No. 91–513, 84 Stat. 1236. Through this act, the people have declared, "The illegal importation, manufacture, distribution and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2). In addition, public policy on drugs is reflected in the Drug Free Schools and Communities Act: "The tragic consequences of drug use and alcohol abuse by students are felt not only by students and their families, but also by their communities and the nation, which can ill afford to lose their skills, talents, and vitality." 20 U.S.C. § 4601(4).

The people have also declared public policy on illegal drugs by refusing to recognize drug abusers as "handicapped" within the meaning of the Rehabilitation Act, 29 U.S.

**538**

C. § 701, *et seq.* This act provides that the term "individuals with handicaps,"

> Does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others.

29 U.S.C. § 706(8)(B). The people have also recognized the strong need to maintain safe work environments. To this end, Congress has enacted the Occupational Safety and Health Act (OSHA), 29 U.S.C. § 651, *et seq.* This act requires that,

> Each employer (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees; (2) shall comply with occupational safety and health standards promulgated under this chapter.

29 U.S.C. § 654. The specific public policy advanced by OSHA is declared in section 651. This section provides,

> Congress declares it to be its purpose and policy, through the exercise of its powers to regulate commerce among the several states and the foreign nations and to provide for the general welfare, to assure so far as possible every working man and woman in the nation safe and healthful working conditions and to preserve our human resources ... by encouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards at their places of employment, and to stimulate employers and employees to institute new and to perfect existing programs for providing safe and healthful working conditions....

29 U.S.C. § 651(b)(1). The continued employment of an employee known to perform his job under the influence of illegal drugs clearly increases the likelihood of death or injury and thus runs contrary to this policy. *See Usery v. Marquett Cement Manufacturing Co.,* 568 F.2d 902 (2d Cir.1977) (hazards caused by employee chargeable to employer if foreseeable and preventable).

The public policy against the operation of potentially hazardous equipment and machinery by employees under the influence of illegal drugs has manifest itself in areas of state government as well. For example, consistent with national policy as reflected in the Federal Rehabilitation Act, the citizens of the State of Georgia have also refused to treat drug abusers as "handicapped." The Georgia Equal Employment for the Handicapped Code specifically excludes from the definition of "handicapped individual" any person "who is addicted to the use of any drug or illegal or federally controlled substance...." O.C.G.A. § 34–6A–2(3). In addition, Georgia, like every other state, has passed legislation making the possession, distribution or sale of drugs a crime. *See* O.C.G.A. § 16–13–25. Furthermore, the people have reaffirmed a policy favoring safe work environments through state laws substantially equivalent to. the Federal OSHA. For example, the public policy of the State of Georgia is reflected in O.C.G.A. § 34–2–10, which provides,

> Every employer shall furnish employment which shall be reasonably safe for the employees therein, ... shall adopt and use methods and processes reasonably adequate to render such an employment and place of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees.

Moreover, under Georgia law, employers are legally obligated "to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency...." O.C.G.A. § 34–7–20. Permitting an employee with a known tendency to perform his duties under the influence of illegal drugs to continue to operate potentially hazardous machinery would be an obvious breach of this statutory standard.

#### (b) *Legal Precedent.*

In determining whether a particular public policy is well defined, the court may also refer to the case law. In this regard, it is significant that the Supreme Court in *Mis-*

co has acknowledged that, while the lower court had failed to demonstrate the existence of such a policy, its assumption that public policy condemns the operation of dangerous machinery by intoxicated workers "is firmly rooted in common sense." [5] *Misco*, 108 S.Ct. at 374. Thus, the Fifth Circuit had recognized the existence of a "serious and well-founded public policy" against the operation of dangerous machinery by workers under the influence of illegal drugs. *Misco, Inc. v. United Paper Workers International*, 768 F.2d 739, 742–43 (5th Cir.1985); *see also Oil Workers Local 4-228 v. Union Oil Company of California*, 818 F.2d 437, 442 (5th Cir. 1987). Similarly, the First Circuit has recently observed,

> There are laws against the sale and use of drugs enacted by all states, ... and the sale and use of drugs is a serious offense under federal laws. Furthermore, the nation has focused on the corrosive consequences of drug sale and use and has devoted itself to their eradication. In particular, the workshop is a place where such usage is abominable not only because of the health hazard it creates, but also because it creates an unsafe atmosphere and is deteriorative of production, the quality of the products, and competition.

*S.D. Warren Company v. United Paper Workers International Union*, 815 F.2d 178, 186 (1st Cir.1987).

A well-defined and dominant public policy against the use of illegal drugs by those engaged in potentially hazardous duties has also been reflected in the decisions of the state courts. For example, the Georgia Supreme Court has recently had occasion to review a municipal policy requiring drug testing of "all employees of the city having police power." *City of East Point v. Smith*, 258 Ga. 111, 365 S.E.2d 432 (1988). In upholding the constitutionality of the policy, the court noted, "Most importantly,

employees who have the authority to carry weapons endanger their fellow employees and the public when their performance is impaired by use of marijuana or other controlled substances." *Id.* at 113, 365 S.E.2d 432. This public policy was deemed "compelling" enough to overcome the city employees' fourth amendment interests. *Id.*

### C. *The Arbitrator's Decision.*

As the court has stated, the arbitrator found that Watson was a chronic heavy drug user; that the level of THC metabolite in his body was sufficient to make him intoxicated at the time of his drug screening; and that the use of marijuana is associated with lethargy and inattention and affects job performance. Nevertheless, the arbitrator ordered Watson's reinstatement to a position requiring the operation and supervision of potentially hazardous electrical equipment and machinery. The arbitrator has therefore interpreted the collective bargaining agreement between plaintiff and the defendant union in a manner which necessarily permits plaintiff to arbitrate the question of whether operation of such equipment and machinery by employees under the influence of illegal drugs can be authorized. In addition, the court has made reference to laws and legal precedents at the federal and state levels and has thereby discovered a well-defined and dominant public policy denouncing the operation of potentially hazardous equipment and machinery by employees under the influence of illegal drugs. The policy is explicitly reflected in legislative enactments and judicial decisions at both the federal and state levels. It follows, therefore, that enforcement of the arbitrator's award in this case would be contrary to public policy as well as place plaintiff in violation of state law and expose it to potential liability under Federal OSHA. In view of these facts, the arbitrator's September 1, 1987

---

**5.** The Supreme Court reversed the court of appeals for two reasons. First, despite the clear requirement that public policy be ascertained by "reference to the laws and legal precedents," the court nevertheless merely judicially noticed the existence of the policy. Second, even assuming the existence of such a policy, the evidence of record failed to demonstrate that the employee in question had actually operated dangerous machinery while intoxicated. Neither situation exists in this case.

decision and award reinstating Watson must be VACATED.

### IV. CONCLUSION.

In sum, the parties' July 18 and December 27, 1988 motions for leave to file supplemental briefs are GRANTED. The parties' May 31, June 23 and June 28, 1988 briefs are hereby STRICKEN, however, as having been filed without leave of court. In addition, plaintiff's motion for summary judgment is GRANTED. The arbitrator's September 1, 1987 decision and award reinstating Watson is hereby VACATED. The defendant union's motion for summary judgment is therefore DENIED and its counterclaim to compel reinstatement and for attorney's fees DISMISSED. This action is hereby TERMINATED.