**S.D. WARREN COMPANY, a DIVISION OF SCOTT PAPER COMPANY,**
Petitioner, Appellant,

v.

**UNITED PAPERWORKERS' INTERNATIONAL UNION, AFL–CIO, LOCAL 1069, Respondent, Appellee.**

No. 86–1405.

United States Court of Appeals, First Circuit.

Argued Nov. 4, 1986.

Decided March 31, 1987.

---

Levin H. Campbell, Chief Judge, concurred with opinion.

S. Mason Pratt, Jr., with whom Elizabeth S. Pearce and Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., were on brief, for petitioner, appellant.

Stephen P. Sunenblick, with whom Charles W. March and Sunenblick & Reben, Portland, Me., were on brief, for respondent, appellee.

Before TORRUELLA, Circuit Judge, CAMPBELL, Chief Judge, and PIERAS,* District Judge.

PIERAS, District Judge.

This appeal is from a judgment of the United States District Court for the District of Maine, enforcing an arbitration

* Of the District of Puerto Rico, sitting by designa-   tion.

award under the jurisdiction provided by section 301 of the Labor-Management Relations Act of 1947, 29 U.S.C. section 185 (1982). The district court upheld the arbitrator's decision that the collective bargaining agreement was ambiguous as to the kind of right given the employer to discharge employees involved with drugs, that the contract allowed the arbitrator to review the degree of punishment to be given the employee, and that the arbitrator's award did not violate public policy. *S.D. Warren Co. v. United Paperworkers International*, 632 F.Supp. 463 (D.Me.1986).

These erroneous conclusions, which are the basis of both the arbitrator's award and the judgment below, require that the judgment be reversed and the award vacated.

## I.

The United Paperworkers' International Union, AFL–CIO, Local 1069, in representation of employees of S.D. Warren Company, entered into a collective bargaining agreement with S.D. Warren. The pertinent portions of the collective bargaining agreement for the purposes of our review follow. The Management Rights Clause affirmed that

> [t]he Company reserves the sole right to manage the business of the Company ... and to direct the working force. This right includes but is not limited to ... the right to ... demote, transfer, discipline, suspend or discharge employees for proper cause or to relieve them from duties because of lack of work or for other legitimate reasons.

The contract provided for levels of conciliation proceedings culminating in arbitration. The scope of the arbitrator's authority was circumscribed as follows:

> the matter may be referred by either party to an arbitrator for decision, but it is agreed that the matter thus referred shall be concerned solely with the interpretation on and/or application of the collective bargaining agreement.... The decision of the arbitrator shall be final and binding on the parties.

The parties to the contract further defined the role of the arbitrator by agreeing that "the arbitrator shall have no power to render a decision which in any way adds to, subtracts from, or modifies any provision of the agreement."

As an appendix, the contract also contained Mill Rules. Rule 7 read as follows:

> 7. Causes for Discharge. In any organization, certain rules of conduct must be observed by the members for the good of all. Violation of prescribed rules are cause for disciplinary action of varying degrees of severity. Violations of the following rules are considered causes for discharge: (a) Possession, use or sale on Mill property of intoxicants, marijuana, narcotics or other drugs. The possession or use of a specific narcotic or drug properly prescribed by a licensed physician is the only exception to this rule.

The seriousness of the drug offenses proscribed in the contract was brought to the attention of the employees many times, including in a union newsletter: "Once again it is necessary to remind everyone that the use of illegal drugs and/or alcohol is, a very serious offense. The company has notified the Union that anyone caught possessing and/or using drugs or alcohol on company property will be immediately terminated."

The Maine State Police Drug Unit investigated the drug problem at employer's plant. An undercover narcotics agent was employed at the mill. As a result of the investigation, twelve employees, including the grievants, were shown to have violated Mill Rule 7(a) and consequently were discharged by the employer.

The Union took the grievance to arbitration. Arbitrator Suzanne Gwiazda found that the grievants had violated Mill Rule 7(a). The arbitrator found extenuating circumstances in each case and decided that suspension, not discharge, was the appropriate sanction. Although we believe that the nature of extenuating circumstances are immaterial for the purpose of deciding this case, we will nevertheless refer to them to demonstrate that such personal concern by the arbitrator violated the clear language of the Management Rights

Clause. The arbitrator took into consideration that grievant Linda Willoughby was the only female in her department and under pressure to do her work faster, was advised by employer's physician to take an extended leave, and was diagnosed as suffering from anorexia nervosa. Willoughby gave the investigator only a small amount of marijuana. Kimberly Denis was also the only woman in her area and dependent on the investigator for a time. She sold the agent twenty dollars worth of marijuana. Grievant Debra Graham was approached by the agent six or seven times about drugs and eventually sold him four grams of marijuana for thirty dollars.

The arbitrator's award was based on the undisputed facts recounted here. The arbitrator's pivotal conclusion, however, was that Mill Rule 7(a) is ambiguous in that it does not use the obligatory "must" when delineating the employer's right to terminate for violation of the rule. Although the permissive "may" does not appear in the contract, the word did appear in this context in the company's safety policy handbook. The arbitrator found this noteworthy and concluded that she could assess the kind of infringement of the rule and provide a punishment less than the sole punishment allowed by the collective bargaining agreement. The arbitrator also relied on the Management Rights Clause's identification of "proper cause" required for discharge while the heading of Rule 7 was simply "Causes for Discharge." This discrepancy, in the arbitrator's eyes, was sufficient to place the entire matter of discipline within her interpretative domain.

The district court affirmed the award, stating that it would not construe "cause" as equivalent to "proper cause" and declined to disturb the arbitrator's decision. *S.D. Warren*, 632 F.Supp. at 468. Further, the court stated that it could not be said that the arbitrator's reasoning was "so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling." *Bettencourt v. Boston Edison Company*, 560 F.2d 1045, 1050 (1st Cir.1977). Consequently, it dismissed the employer's complaint. The court also found that the award did not violate public policy. *S.D. Warren*, 632 F.Supp. at 468.

We disagree that Mill Rule 7(a) was so ambiguous that it took away from the employer the exclusive right to determine the punishment to be imposed for violation of that clause, and that the scope of the arbitration clause invested the arbitrator with the ultimate decision pertaining to punishment. We also disagree with the arbitrator and court below that the award does not violate public policy. Accordingly, we reverse the district court's judgment and vacate the arbitration award.

## II. THE ARBITRATOR'S AUTHORITY TO INTERPRET THE CONTRACT

The fact that cases, for quite practical reasons, have allowed arbitrators great latitude in interpreting collective bargaining agreements does not detract from the fact that all arbitration awards must draw their essence from the collective bargaining agreement. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The purpose of the bargaining is to reach an agreement where competing yet legitimate interests are defined and accommodated. The definition of such interests is important because ambiguity may cost the parties great loss and irreparable damage through strikes, work slow-downs, and lawsuits that affect the stability of the employer and its employees. Labor negotiations are an intense enterprise that, besides taking precious time and money, settle general business planning. Dealing with the economic survival of all concerned, they are often emotionally charged. During the course of negotiations, parties give in to each other's wishes in exchange for some advantage gained. Thus, the wills of the parties are tempered and accommodated to the point where the meeting of the minds is forged into a social contract, the collective will of all. This dear time invested in negotiations creates a balance of rights and obligations—rarely equaled by the best prestidigitator in his prime—which is essential to the administration of the enterprise and serves as the legal train that carries

the relations between the employer and its unionized employees. This balance of equities cannot be disturbed by glossing onto the contract the social philosophy of an arbitrator. The contract itself, not the arbitrator, is the social instrument containing the collective reason of the parties to it.

In order to promote arbitration and avoid delays in decision that industries can ill afford, Congress enshrined arbitration as the preferred means of resolving industrial disputes. Labor-Management Relations Act of 1947 § 203(d), 29 U.S.C. § 173(d) (1982). It is salutory to protect the conciliation and arbitration procedure of the collective bargaining contract. In most cases, disputes are resolved at the initial level of the meeting between the foreman and the shop steward or between the personnel manager and the union representative that takes place on the premises immediately following the grievance. If the grievance proceeds to arbitration, the dispute is reviewed by persons usually conversant with the industry and its problems and sitting in the same community as the parties. Such a procedure keeps the wheels of production and progress turning without interruption. Therefore, the courts have devised a series of rules to smooth the arbitration procedure and effectively endowed the arbitrator with extraordinary authority, even more authority than a court of first instance. *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) (arbitration clause will preempt court jurisdiction over labor dispute); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) (disputes between employer and union presumptively arbitrable); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) (arbitration awards shall be enforced unless they do not draw their essence from the collective bargaining agreement).

Most reasons advanced for the special treatment of the conciliation and arbitration procedure have been of a practical nature. Compared with litigation, arbitration is is more expedient and less expensive. The agreement that the arbitrator's award be final and binding cuts off further uncertainty as to the rule of the shop, and allows greater efficiency and better planning through a peaceful resolution of labor disputes. R.I. Abrams, "The Integrity of the Arbitral Award", 76 Mich.L.Rev. 231 (1977). Deeming it necessary to protect this working procedure in the labor relations field, the courts have adhered to the rule that an arbitrator's interpretation of the collective bargaining agreement is final and binding on the parties because it is the interpretation that is bargained for by the parties. *Enterprise Wheel & Car*, 363 U.S. at 597, 80 S.Ct. at 1361; *In re Hotel Da Vinci, Inc.*, 797 F.2d 33, 34–35 (1st Cir.1986); *Hoteles Condado Beach v. Union*, 763 F.2d 34, 41 (1st Cir.1985).

Nevertheless, the courts have not been willing to sacrifice logic, reason, and sound principles of contract law on the altar of the practicality of giving unlimited power to arbitrators and absolute deference to their interpretations of collective bargaining agreements.

> An arbitrator is confined to the interpretation or application of the collective bargaining agreement; he does not sit to dispose his own brand of industrial justice. He may, of course, look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Enterprise Wheel & Car*, 363 U.S. at 597, 80 S.Ct. at 1361.

This Circuit has followed this directive allowing an arbitration award to be vacated when the award is " 'unfounded in reason and fact' ... or is based in reasoning 'so palpably faulty that no judge or group of judges could ever conceivably have made such a ruling,' or is mistakenly based on a crucial assumption which is 'concededly a non-fact.' " *Bettencourt*, 560 F.2d at 1050 (citations omitted). Other circuits have dealt with the limitation of the power of an arbitrator and have found that he is "confined to the interpretation and application

of the collective bargaining agreement, and although he may construe ambiguous contract language, he is without authority to disregard or modify plain and unambiguous provisions." *Detroit Coil v. International Association of Machinists,* 594 F.2d 575, 579 (6th Cir.) *cert. denied,* 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979).

█ The Federal Arbitration Act, 9 U.S.C. § 10 (1982) is applicable to labor cases of this nature. *Electronics Corporation of America v. International Union of Electrical, Radio and Machine Workers, Local 272,* 492 F.2d 1255, 1258 (1st Cir.1974); *see also Hoteles Condado Beach,* 763 F.2d at 42. The act provides that a district court may issue an order vacating an award

(d) [w]here the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and indefinite award upon the subject matter submitted was not made.

When the arbitrator exceeds her power or imperfectly executes it to the extent outlined in the Federal Arbitration Act, the arbitration award cannot draw its essence from the collective bargaining contract and such construction is not the one the parties bargained for.

█ The usual case is where the management prerogative to discipline is not coupled with a specific punishment for the violation. Then, the punishment imposed by management together with the factual basis for the punishment is subject to review by the arbitrator. This is not the case before us. Here, not only did the collective bargaining agreement specifically delineate the precise punishment for violation of Mill Rule 7(a) ("violations of the following rules are considered causes for discharge ..."), the agreement also contained a Management Rights Clause reserving to the company "the right to ... discharge employees for proper cause." The agreement further specified that "the arbitrator shall have no power to render a decision which in any way adds to, subtracts from or modifies any provision of the agreement." Collective Bargaining Agreement, Art. XII, section 6.

The case of *Local 217, International Union of Electric, Radio and Machine Workers v. Holtzer-Cabot Corporation,* 277 F.Supp. 704 (D.Mass.1967), dealt with a contract where the offense and the penalty for that offense were specified.

31. *Personal Conduct*

The extent of any disciplinary action will depend upon the seriousness of the offense in the judgment of the Factory Management, with due regard for previous records of factory rules observance. As a guide for personal conduct, there are listed below certain acts of misconduct that should be avoided for the good of all. These actions or rule violations are classified into three categories: the least serious rule violations are listed under Group I, the more serious under Group II, and the most serious under Group III.

*Group II.*

c. The making of false, vicious, or malicious statements concerning another employee....

f. The use of abusive, obscene, profane, or threatening language to fellow employees.

*PENALTIES FOR FAILURE TO OBSERVE COMPANY RULES*

*Group II*

First Violation of any Group II Rule: One week's suspension without pay.

Second Violation of same rule or two first violations of different Group II Rules: Dismissal.

*Local 217,* 277 F.Supp. at 707.

The arbitrator found a violation of the above-cited rule. The court decided that the penalty for violation of the rule in question was a matter left to the discretion of management and that the arbitrator could not modify the penalty "simply because he thought mitigating circumstances rendered [suspension] too severe." 277 F.Supp. at 708. The court further stated that the arbitrator, having found that the employee violated the rule, lacked authority under the contract to alter the penalty.

In *International Brotherhood of Firemen and Oilers v. The Nestle Company,*

630 F.2d 474 (6th Cir.1980), the court reversed the judgment of the district court enforcing an arbitration award. The collective bargaining agreement contained a standard management rights clause. It described particular violations as follows: "Art. XII(a) Intoxication, dishonesty, incompetency, insubordination or failure to perform satisfactorily the usual, customary duties of the employee, shall constitute cause for the dismissal of an employee from the service of the company." 630 F.2d at 475. The arbitrator found that the offense had been committed but reduced the penalty determined by management. The Sixth Circuit, in vacating the award and characterizing the arbitrator's reasoning as "incredible," stated:

> In our case, the collective bargaining agreement expressly provided that insubordination shall be grounds for discharge. It is clear and unambiguous. It needs no interpretation and we find no provision in it giving the arbitrator power to prescribe the penalty for violation of the collective bargaining agreement or to control the exercise of it by the employer. This power was vested solely in the employer.

630 F.2d at 477.

All these decisions are grounded on the principle that in management resides the inherent right to manage and that the right to manage includes the prerogative to discharge for cause. If the parties to a collective bargaining agreement have the intention to reverse this traditional understanding, they must do so by express and clear language divesting the employer of this right. The language in the contract before us specifies the penalty for violation of Mill Rule 7(a). Instead of withdrawing the rights of management, the parties ratified them.

■ Now we must examine the award and the judgment below in the light of the contract to see if the contract was ambiguous. The bare argument of ambiguity is based on the fact that Mill Rule 7(a) does not state in so many words that the employer must terminate an employee for a violation. Appellee argues that this makes the rule ambiguous and that therefore the arbitrator could determine the punishment. It is further argued that the contract is also ambiguous because, in the General Management Clause, the employer may terminate for "proper cause" and in Rule 7 providing the authority to terminate, the heading reads "Causes for Discharge."

We disagree. The phrases "proper cause" and just plain "cause" in the labor relations parlance are interchangeable and have the same meaning. The common, everyday meaning is identical; all connote the conclusion that there is a cause that justifies the action. Cf. 2 Collective Bargaining: Negotiations and Contracts (BNA) § 40:1 (1983) (grouping "for cause" and "for just cause" dismissal standards for statistical purposes). If possession of marijuana is cause for discharge, as Mill Rule 7(a) flatly says, we are at a loss to see how it would not also be "proper cause" for discharge. The agreement does grant the employer the right to apply disciplinary action varying in degree of severity in accordance with the rule violated: "Violation of prescribed rules are cause for disciplinary action of varying degrees of severity." This clause applies to certain violations. But as to violations of Rule 7(a), the right of the employer is to discharge. Therefore, we conclude that the parties at the bargaining table had a meeting of the minds, that in cases of possession, use, or sale of marijuana on company property, the employer had a right to discharge.

In the case of *Litvak Packing Co. v. Amalgamated Butcher Workmen Local No. 641,* 455 F.Supp. 1180 (D.Colo.1978), the contract provided: "No employees covered by this agreement shall be suspended, demoted or dismissed without just and sufficient cause. Sufficient cause for discharge shall include, among other reasons ... insubordination." *Id.* at 1180. The employer discharged the employee for insubordination. However, the arbitrator found extenuating circumstances and concluded that "[o]n balance, [the] indiscretion [does] not warrant the penalty of discharge" and ordered his reinstatement with back pay accruing after a two-month sus-

pension. *Id.* at 1181. The district court vacated the award. The union in *Litvak* argued in the same manner as appellee here, that because just cause was not defined, it was within the arbitrator's authority to find that, even though sufficient cause for discharge existed, the dismissal of the employee was not "just" under the circumstances of the case. The court rejected this argument.

> To interpret the agreement as suggested by the defendants, however, would render meaningless the lengthy and specific elaboration of "sufficient" cause for discharge contained in article 6 of the agreement. The only rational purpose of the provision is to grant the employer an absolute right to terminate an employee for serious misbehavior, including ... insubordination....

*Id.* at 1182; *see also Mistletoe Express Service v. Motor Expressmen's Union*, 566 F.2d 692, 694 (10th Cir.1977).

The rationale as to why, when the employer has gained at the bargaining table the right to impose certain disciplinary action, the arbitrator has no right to determine the kind of disciplinary action has been expressed by the Fourth Circuit as well.

> The reservation of a right to either discipline or discharge for cause could be wholly ineffective and meaningless if the employer's action, pursuant to such right, is subject to review by an arbitrator on the basis of appropriateness. If the reserved right is construed to mean that the employer can take no disciplinary action in excess of a reprimand, except at its own risk and subject to severe penalties in case an arbitrator should later be of the opinion that some milder action is appropriate, the effect would be that employer's inherent right which has not been expressly relinquished by contract is no right at all.

*Textile Workers Union v. American Thread Co.*, 291 F.2d 894, 899 (4th Cir. 1961). When the general just cause provision for discharge is coupled with a specific penalty provision, the appropriateness of the penalty is removed from consideration and is without the scope of review of the arbitrator. *See Morgan Services, Inc. v. Local 323, Chicago and Central States Joint Board*, 724 F.2d 1217, 1221–22 (6th Cir.1984) (gathering cases).

If this arbitration award is to stand, the employer will lose in the arbitration process what it earned the hard way at the bargaining table. In the absence of Mill Rule 7(a), the employer's determination to impose the penalty of discharge would be subject to be reviewed by an arbitrator. By incorporating Mill Rule 7(a), however, the parties had the intention of allowing one of them, the employer in this case, to determine the nature of the punishment: the maximum of discharge on the first offense or no penalty. Otherwise, the parties would have remained mute and the pretention of this arbitrator as to interpretation of this clause would be valid. In the absence of this language, the employer could have discharged the employee and such action would had been subject to arbitral review. Then why incorporate Mill Rule 7(a)? We cannot accept that the parties did something with no meaning. Labor negotiators must also be given great respect because they are the real parties in interest and the ones that in the long run will suffer or benefit from their acts at the negotiating table. We should not be inclined to conclude that what they agreed upon is ambiguous, for that would be splitting hairs to find a way to thwart the contractual will. On the contrary, we should find that the contract has a regular, logical meaning.

In this case, the parties have cooperated in the forging of their collective bargaining agreement and confirmed the right of manager to manage and to exercise discretion by discharging employees involved in drugs, believing that drugs in the workplace is affecting production, efficiency, quality, and plant safety. Management, with the negotiated concurrence of the union, determined that the drug scene creates a hostile and undesirable work environment that could not be tolerated. Discharge was stipulated, therefore as a penalty to be meted out by management. Under these circumstances, the imposition by the arbi-

trator of a punishment the parties did not bargain for does not draw its essence from the collective bargaining agreement and such a construction is not the one the parties bargained for.

## III. PUBLIC POLICY

To examine the issue of public policy raised by the employer in perspective, we must consider the effect of the use of drugs in the shop and its effect on the safety of all employees.

### A) *The relation of use of drugs to safety*

■ This is a paper mill where the employees, among other things, handle large, bulky materials and drive heavy machinery and trucks. The arbitrator concluded that "drug-dealing constitute[s] a danger to all employees' safety." One of the grievants, Kimberly Denis, admitted that smoking marijuana while working was dangerous. "I never smoked in the mill; it's a good way to lose your fingers." The arbitrator concluded that possessing or selling marijuana at work jeopardizes the safety of all workers. The employer and union, in their notices to employees, stated that the use of drugs in the shop creates dangers and is unsafe. The union summarized the effect of the use of drugs in the shop in a newsletter: "The union can only hope that everyone will follow these rules and not jeopardize their job, their families, or the safety of their fellow workers." In connection with this statement, we are at a loss to see how the union insists on permitting employees known to be drug user and sellers to continue employment to the detriment of employees who do not use drugs. The union represents all employees, and the welfare of all employees should be paramount.

In view of the evidence and the conclusion of the arbitrator, we conclude that the use and sale of drugs in this shop is dangerous and constitutes a threat to the safety of all the employees. It also constitutes a violation of the state and federal law.

### B) *Whether there is a well-defined public policy against the use of drugs in the workplace*

■ We must examine the facts in this context by examining the laws and legal precedent pertaining to illegal drug sale and use. We do so, mindful that particularly in the labor field, the Supreme Court has unequivocally stated that "the question of public policy is ultimately one for resolution by the courts." *W.R. Grace and Co. v. Local Union 759*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983).

There are laws against the sale and use of drugs enacted by all states, including the State of Maine, and the sale and use of drugs is a serious offense under federal laws. *E.g.*, 21 U.S.C. § 841 (Supp. III 1985). Furthermore, the nation has focused on the corrosive consequences of drug sale and use and has devoted itself to their eradication. In particular, the work shop is a place where such usage is abominable not only because of the health hazard it creates, but also because it creates an unsafe atmosphere and is deteriorative of production, the quality of the products, and competition.

We conclude that there is a well-defined public policy against the use of drugs in the workplace.

### C) *The arbitration award and public policy*

■ The court cannot enforce arbitration awards that do not draw their essence from the collective bargaining agreement. *Enterprise Wheel & Car*, 363 U.S. at 597, 80 S.Ct. at 1361. The courts vacate such awards as outside of the power of the arbitrator. Likewise, when the arbitrator's exercise of power, either inside or outside the scope of the collective bargaining agreement, contravenes explicit public policy, the court cannot stand idly by.

The Supreme Court had noted in a number of areas that an arbitration award should be vacated if the award is in "manifest disregard" of the law. *E.g.*, *Wilko v. Swan*, 346 U.S. 427, 436–37, 74 S.Ct. 182, 187–88, 98 L.Ed. 168 (1953) (securities arbi-

tration). Lower courts have vacated labor arbitration awards entered against public policy. *United States Postal Service v. American Postal Workers Union,* 736 F.2d 822 (1st Cir.1984) (reinstatement of postal worker convicted of embezzlement vacated even though award did not violate a particular statute); *American Postal Workers Union v. United States Postal Service,* 682 F.2d 1280 (9th Cir.1982) (reinstatement of postal strikers who violated 5 U.S.C. § 7311 vacated), *cert. denied,* 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 431 (1983); *Teamsters Local Union 249 v. Consolidated Freightway,* 464 F.Supp. 346 (W.D.Pa.1979) (award vacated when practical effect was to require truck drivers to violate state highway safety laws). *See generally,* Comment, *Employment at Will in the Unionized Setting,* 34 Cath.U.L. Rev. 979, 1004 (1985) (authored by David L. Durkin).

The appellee union insinuates that in order to apply public policy, we must find a statute providing that possession and distribution of marijuana in the workshop of a paper mill is a crime punishable by a jail sentence. We do not believe the statute in question in any particular case must be so definite as applicable to any particular industry. This Circuit held that, although there was no specific statute to the effect that a postal employee could not steal postal money orders, to uphold the award would clearly contravene the general statute outlawing embezzlement. *Postal Workers,* 736 F.2d at 825. The penal statutes in the instant case treat all persons the same: no distinction is made for persons whose activities may endanger lives and property by their drug use. But, in both cases, when viewed in relation to the industry, these statutes acquired special import. The use of drugs in the case before the court created a dangerous situation that imperiled the safety of fellow employees. A hostile atmosphere developed where innocent workers were grouped together with "junkies." In *Postal Workers,* the violation of the law became an issue of public policy under less detrimental circumstances. In this more life threatening case, this court can do no less. This

arbitration award cannot be enforced as a matter of public policy. *Cf. Misco, Inc. v. United Paperworkers International,* 768 F.2d 739 (5th Cir.1985) (enforcement denied to award reinstating paper mill employee who violated company rule against possession of marijuana on mill premises because award violated public policy), *cert. granted,* — U.S. ——, 107 S.Ct. 871, 93 L.Ed.2d 826 (1987).

The arbitrator refused to consider the plain meaning of the words that the parties agreed upon. Under these circumstances, the imposition by the arbitrator of a punishment the parties did not bargain for does not draw its essence from the collective bargaining agreement and such a construction is not the one the parties bargained for. The linguistic legerdemain that this arbitrator performed was an attempt to garner more authority to herself than the parties agreed to give her. As such, she exceeded her authority. When the parties enshrined in the contract their intention that "violations of the following rules are considered causes for discharge: (a) possession, use or sale on mill property of intoxicants, marijuana, narcotics or other drugs," they meant just that, and the employer had the unhampered right to discharge.

In a separate appeal, consolidated with this case, the company has objected to the district court's denial of its motion under Fed.R.Civ.P. Rule 60, for relief from judgment. Given our resolution of the company's appeal from the district court's denial of the petition to vacate the arbitration award, the Rule 60 appeal is moot.

## IV. CONCLUSION

For the above reasons, we reverse the judgment of the district court denying the company's motion to vacate the arbitration award and remand for further proceedings consistent with this opinion. The appeal from the denial of the Rule 60 motion is dismissed as moot.

LEVIN H. CAMPBELL, Chief Judge (concurring).

Because the reasoning in Part II fully justifies the court's result, I see no occa-

sion to reach the public policy argument set out in Part III. I therefore concur in the court's judgment and in the rest of its opinion, but I do not join in the public policy analysis found in Part III.