FREIGHTLINER, LLC, a Delaware limited liability company, Petitioner,

v.

TEAMSTERS LOCAL 305, an Oregon labor union, Respondent/Counter-claimant.

No. Civ.03–1170–MO.

United States District Court, D. Oregon.

Sept. 15, 2004.

Carol A. Noonan, Davis Wright & Tremaine, LLP, Portland, OR, Henry E. Farber, Davis Wright Tremaine LLP, Bellevue, WA, for Plaintiff.

Paul C. Hays, Carney Buckley Hays & Marsh, Portland, OR, for Defendant.

## OPINION and ORDER

MOSMAN, District Judge.

In this arbitration dispute, petitioner Freightliner, LLC asks the court to vacate an arbitrator's decision reinstating Freightliner employee John Thomas, whom Freightliner terminated for marijuana use. Respondent Teamsters Local 305 ("Teamsters"), Mr. Thomas's union representative, argues there is no basis for overturning the arbitrator's decision. Both Freightliner and Teamsters have filed motions for summary judgment. The court concludes the arbitrator's decision should be overturned. Thus Freightliner's motion for summary judgment is GRANTED (doc. # 11), and Teamsters' motion is DENIED (doc. # 15).

## I. BACKGROUND

The underlying core facts are not disputed. Freightliner manufactures large commercial and military trucks. In 1993,

Freightliner hired Thomas as a materials handler. Thomas's duties included operating a forklift, a dolly, or other devices to deliver various parts to production lines and warehouses. The parties agree Thomas, as a general matter, is a highly skilled forklift operator.

However, on December 14, 2002, Thomas's operation of a 24,000 pound forklift caused an accident in a dimly lit area of a warehouse resulting in damage to an overhead water supply pipe. Freightliner determined that the accident was "preventable," thereby giving the company authority to test Thomas for drug use.

On the same day that he underwent a urinalysis drug screen, Thomas informed Freightliner he had a prescription for medical marijuana he had obtained in early October 2002 pursuant to the Oregon Medical Marijuana Act, ORS 475.300 *et seq.*

Thomas obtained the prescription because he suffered severe pain from, among other injuries, his two dislocated knees. To alleviate his pain, Thomas admitted he smokes one ounce of marijuana—the equivalent of one or two marijuana cigarettes—each evening, usually between 5:00 p.m. and 9:00 p.m. Thomas testified before the arbitrator that he does not suffer any lingering "morning after" effects from the marijuana he smokes and thus believes his use of marijuana does not actually impair his job performance.

Freightliner allowed Thomas to work full shifts on December 15 and 16, 2002. But at the end of his shift on December 16, two days after the accident, Thomas underwent the urinalysis. Two days later, on December 18, 2002, Freightliner learned that Thomas's drug screen came back positive, showing a high degree of THC concentration. Freightliner decided to suspend Thomas that same day. A few weeks later, on January 15, 2003, Freightliner terminated Thomas, after he refused to agree to new terms of employment, including participation in a drug-treatment program and consent to future drug tests. Freightliner's termination letter explained it was terminating plaintiff for violating the company's drug-and-alcohol policy. Specifically, the letter explained, Thomas was found to have been "under the influence" and also failed to comply with the company's notification requirement regarding use of prescription drugs.

After being terminated, Thomas filed a grievance pursuant to the collective bargaining agreement ("CBA"), which required arbitration. Arbitrator Carlton Snow, a professor of law, decided Thomas's grievance in his favor, ordering Freightliner to reinstate Thomas to his position as a materials handler. Because the terms of Mr. Snow's decision are important to meaningful resolution of the issues before this court, his decision is discussed in some detail below.

The central issue presented for arbitration was framed as follows: "Did the Employer suspend and terminate the grievant for just cause in accordance with the parties' labor contract?" Under the terms of the collective bargaining agreement, Freightliner could terminate Thomas only if it had "just cause" to do so.

Teamsters argued there was no just cause because Freightliner did not timely test plaintiff for drug use, waiting until two days after the accident to perform a urinalysis. Mr. Snow determined the CBA did not mandate a drug test at any particular time after an accident. Mr. Snow also rejected Freightliner's argument that Thomas failed timely to inform the company about his marijuana prescription. Snow concluded the CBA's prescription-drug provision required notice but did not specify any particular time period for giving such notice.

As Mr. Snow saw it, the core issue was whether Freightliner could terminate

Thomas for his being "under the influence." Freightliner's drug policy (which the CBA expressly incorporated) provides:

Reporting for duty or working while under the influence of any drug or alcohol (whether or not legally intoxicated) is specifically prohibited and will be cause for suspension without pay or discharge, depending on the circumstances.

Before the arbitrator, Freightliner and Teamsters proffered varying interpretations of this provision. According to Freightliner, "under the influence" means simply that the employee tested positively for drug use. Freightliner's interpretation was taken from the specific language used in its drug policy, which defined "under the influence" to include "[d]rug or alcohol usage resulting in a positive drug screen." And, under the heading "positive drug levels," the policy provided, in pertinent part: "The minimum quantitative level for marijuana (THC) by urine sample is 30 ng/ml to be considered positive for drug testing purposes." Despite these definitions in the CBA, Teamsters argued that "under the influence" means "physical or mental impairment exhibited by an employee."

Accepting Freightliner's definition, Mr. Snow concluded that, for purposes of resolving the instant dispute, "under the influence" means "drug usage resulting in a positive drug screen."

Mr. Snow, however, emphasized that the drug test did not prove the grievant was ever "physically or mentally impaired on the job." According to Mr. Snow, the positive drug test also "did not prove the physical and mental effect of ingestion [of marijuana] for this particular individual."

Nevertheless, applying Freightliner's definition of "under the influence," Mr. Snow determined Thomas was in fact under the influence, because he had tested positively for marijuana usage. That did not end the matter, however, according to Mr. Snow. Rather, to resolve the issue of just cause, Mr. Snow reasoned that Freightliner carried the burden of showing its drug policy was "in accord with Oregon law." He determined the CBA made clear the parties' intention "to conform" to Oregon law.

Mr. Snow, therefore, felt compelled to consider Oregon's Medical Marijuana Act in determining whether Freightliner had "just cause" to terminate Thomas. While federal drug laws provide no exception for medical marijuana, see *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 491, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001), Snow reasoned that state law, and thus the Oregon Marijuana Act, controlled consideration of the CBA, because the "law of contracts is predominantly state law, not federal law."

Snow concluded that, in light of the Marijuana Act, an employer cannot "discipline an employee (1) who ingests marijuana pursuant to a valid prescription, (2) does so on his or her own time, and (3) reports to work in an unimpaired state of being." Snow further concluded that because of the Marijuana Act, Thomas could not "be deemed 'under the influence' and, therefore, eligible for discipline under the Company's drug policy simply by virtue of testing positive for marijuana."

Snow found that the Act protected Thomas, because there was no evidence he "was physically impaired in the workplace" or used "marijuana in the workplace or on company time." Given these circumstances, Mr. Snow attempted to strike a balanced decision, distinguishing between actual impairment and mere use:

If [Thomas] appears at work mentally or physically impaired and while impaired tests positive for marijuana in his system, it is reasonable for management to conclude that he is "under the influence" and to discipline him pursuant to the Company drug policy. Oregon law

amended the Company's definition of "under the influence," and the definition understood against the backdrop of this law means the Company failed to have just cause in this case.

On August 28, 2003, Freightliner moved to vacate Snow's decision on the grounds he exceeded his authority by relying on the Marijuana Act and his decision violates public policy. On March 18, 2004, Freightliner filed a motion for summary judgment arguing Snow's decision, as a matter of law, is invalid.

## II. DISCUSSION

The Ninth Circuit has identified four grounds supporting vacatur of an arbitration decision resolving a labor dispute: (1) the award does not draw its "essence" from the CBA and thus the arbitrator effectively dispensed "his own brand of industrial justice," (2) the arbitrator exceeded the boundaries of the issues submitted for decision, (3) the award is contrary to public policy, or (4) the award was procured by fraud. *Southern Calif. Gas Co. v. Utility Workers Union of Am.*, 265 F.3d 787, 792–93 (9th Cir.2001). In this case, Freightliner relies on two of these grounds, arguing the essence of Snow's decision was not drawn from the CBA and his award violates public policy. As discussed below, the court finds that the decision failed to draw its essence from the CBA; thus, the court need not decide whether the award violates public policy.

■■■ Arbitrators generally are "not bound by the four corners of the [CBA]." *Phoenix Newspapers, Inc. v. Phoenix Mailers Union, Local 752*, 989 F.2d 1077, 1081 (9th Cir.1993). In determining the contours of the CBA, arbitrators may draw from a wide array of sources including "statutes, case decisions, principles of contract law, practices, assumptions, understandings, the common law of the shop and the industrial common law." *Hawaii*

*Teamsters Local 996 v. United Parcel Serv.*, 241 F.3d 1177, 1184 (9th Cir.2001); see also *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) (observing arbitrators may "look for guidance from many sources").

■■■ As stated, however, a district court must vacate an arbitrator's decision if the arbitrator "dispensed his own brand of industrial justice by making an award that does not draw its essence from the collective bargaining agreement." *Hawaii Teamsters*, 241 F.3d at 1181 (citation omitted); see also *Enterprise Wheel*, 363 U.S. at 597, 80 S.Ct. 1358 ("[An arbitrator's] award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."). Thus an arbitrator has no discretion to "ignore[ ] the plain language of the" CBA, instead following "his own whims and biases." *Hawaii Teamsters*, 241 F.3d at 1181 (citations omitted). But as long as an honest " 'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that a 'court is convinced he committed serious error does not suffice to overturn his decision.' " *Eastern Assoc. Coal*, 531 U.S. at 62, 121 S.Ct. 462 (quoting *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). Under Ninth Circuit case law, the arbitrator is deemed not to have been construing or applying the CBA if his interpretation fails to qualify as a "plausible interpretation of the contract." *Phoenix Newspapers*, 989 F.2d at 1080, 1083; accord *SFIC Props., Inc. v. District Lodge No. 94*, 103 F.3d 923, 924 (9th Cir.1996). Stated a little differently, an arbitrator's award is reversible when the arbitrator " 'manifestly disregard[ed]'

the contours of the agreement." *Phoenix Newspapers,* 989 F.2d at 1081 (quoting *Stead Motors of Walnut Creek v. Auto. Machinists Lodge. No. 1173,* 886 F.2d 1200, 1205 n. 6 (9th Cir.1989) (*en banc*)); see also *United Food & Commercial Workers v. Foster Poultry Farms,* 74 F.3d 169, 173 (9th Cir.1995) ("A court must limit its review to whether the arbitrator's solution can be rationally derived from some plausible theory of the general framework or intent of the agreement."). Thus although an arbitrator "may construe ambiguous contract language, he is without authority to disregard or modify plain and unambiguous provisions." *S.D. Warren Co. v. United Paperworkers Int'l Union,* 815 F.2d 178, 182 (1st Cir.1987) (citation omitted), *vacated on other grounds by* 484 U.S. 983, 108 S.Ct. 497, 98 L.Ed.2d 496 (1987), *on remand,* 845 F.2d 3 (1st Cir. 1988).

Freightliner's arguments can be summarized as follows: First, according to Freightliner, Mr. Snow blatantly ignored the CBA's plain language which did not permit consideration of external law. In addition, even assuming Snow could look to external law, Freightliner argues he manifestly misinterpreted the Act's provisions. Although the standard is deferential, the court concludes that Snow's decision failed to draw its essence from the CBA.

### A. "Under the Influence"

As mentioned, the CBA's drug policy provided: "Reporting for duty while *under the influence* of any drug or alcohol (whether or not legally intoxicated) is specifically prohibited and will be cause for suspension without pay or discharge, depending on the circumstances." (Emphasis added). The CBA, in turn, gives the phrase "under the influence" two components: "[1] Behavior that adversely affects job performance, mobility, safety, or speech with evidence of drug or alcohol

usage. [2] Drug or alcohol usage resulting in a positive drug screen." The CBA's drug policy further specified that "positive drug levels" include urine samples showing "marijuana (THC)" at levels of 30 ng/ml or higher.

■ Under these CBA provisions, the court agrees that Thomas was "under the influence" and subject to termination, even if he was not actually impaired from his use of marijuana. Thomas's urinalysis revealed a THC level of 2,146 ng/ml—a level seventy times greater than the limit specified by the CBA (30 ng/ml). Accordingly, construing the above CBA provisions, this case fits neatly under the cases holding that arbitrators dispensed their own brand of industrial justice in ordering reinstatement of employees who had used or possessed marijuana, despite CBA drug-policy provisions clearly justifying termination. See, e.g., *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union,* 76 F.3d 606, 607–09 (4th Cir.1996); *Warrior & Gulf Navig. Co. v. United Steelworkers,* 996 F.2d 279, 280–81 (11th Cir.1993); *S.D. Warren Co.,* 815 F.2d at 183–85.

### B. Snow's Reliance on Marijuana Act

■ However, the case at bar is complicated by the fact Thomas legally uses marijuana pursuant to a prescription obtained under the Oregon Medical Marijuana Act. As already discussed, Mr. Snow relied on that Act to excuse Thomas's marijuana use. Accordingly, the threshold issue is whether Snow had authority to disregard the plain CBA language discussed above and instead rely on the Marijuana Act.

At this point, it is helpful to review Snow's reasoning in deciding to rely on that Act. Snow accepted that Thomas's positive drug screen meant he was "under the influence"; accordingly, Snow contin-

ued, it was "unnecessary to resolve whether or not there was any physical or mental impairment that results from the drug use." Arbitration Decision at 16–17. Snow thus states it plainly: "[Thomas] was under the influence based on the presence of drugs in his system." *Id.* at 17. Up to this point, Snow's reasoning is entirely consistent with the CBA's unequivocal definition of "under the influence." Then, however, Snow departs from the CBA's provisions.

As an initial matter, even though he had just concluded that Thomas was "under the influence," Snow takes great effort to emphasize that the drug test did not show Thomas "was physically or mentally impaired." *Id.* at 18. However, he did not cite any CBA provision making the issue of impairment relevant; indeed, as mentioned, he had correctly concluded that the definition of "under the influence" made actual impairment a non-issue.

In any event, even though Snow concluded that Thomas's positive drug test fit the CBA's definition of "under the influence," Snow reasoned he also had to check the case against the Marijuana Act. Snow's decision to apply that Act and thus reinstate Thomas can be traced to the following determination made by Snow: The CBA itself manifests an intent on the parties' part to "*conform* to the law." *Id.* at 19 (emphasis added). In using that phrase, Snow meant that the parties wanted the CBA's drug policy to be read "by reference to state law." *Id.* at 24. In other words, Snow read the CBA as expressing an intention to incorporate or track the policies and provisions of the Marijuana Act.

In concluding that the parties had such an intention, Snow specifically relied on CBA Articles 5 and 21. Article 5, however, does not mention application of external law, but instead merely establishes an anti-discrimination policy:

It is the continuing policy of the Employer and the Union that the provisions of this Agreement shall be applied to all persons without regard to race, color, religion, national origin, sex, age or disability.

To the extent Snow relied on Article 5 to find an intent to "conform" generally to Oregon law, the court concludes Snow's interpretation is not even "plausible." See *Phoenix Newspapers,* 989 F.2d at 1080 (observing award must be enforced only if it represents a "plausible interpretation" of the CBA). Article 5 concerns only a single, narrow issue (discrimination) and does not even arguably suggest that the CBA was meant, as a general matter, to be given meaning by reference to Oregon drug laws.

The court additionally finds that Article 21 does not support Snow's reasoning; that Article is a basic "severability" provision which contemplates the possibility of certain provisions being found *invalid:*

If any Article or Section of this Agreement should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement ... shall not be affected thereby.

This provision does not at all suggest that the parties generally intended for arbitrators to incorporate external law into the CBA or read the contract in light of such law. Instead, the provision concerns only the effect on the remainder of the CBA should a decision-maker find that external law affirmatively renders isolated CBA provisions illegal.

▇ In sum, neither Article 5 nor Article 21 even arguably provide a basis for an interpretation that the parties intended for the CBA to conform with or otherwise

incorporate the Marijuana Act. (It is telling that Snow only summarily cited Articles 5 and 21, and did not discuss or even quote their language.) Put simply, Snow cited no credible internal authority justifying his reliance on the Marijuana Act and resultant disregard of the CBA's plain language about marijuana use. As explained by a leading treatise discussing arbitrators' decisions regarding whether to follow external law or the CBA's unambiguous provisions in deciding a particular issue:

> [I]f the agreement and external law do conflict, and if the award is based, to use the Supreme Court's *Enterprise Wheel* words, "solely upon the arbitrator's view of the requirements of enacted legislation . . . the award would not withstand court review *unless* both parties authorized the arbitrator to decide the case in conformity with external law".

Elkouri & Elkouri, *How Arbitration Works,* at 513–14 (6th ed.2003) (citing *Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. 1358) (emphasis added). Here, the parties did not authorize Snow "to decide the case in conformity with external law." *Id.* If an arbitrator could ignore plain contractual language and instead stray into a state's books of statutes and case law based upon nothing but a CBA's basic anti-discrimination or severability provision, as Snow suggested he could do in this case, the parties to a CBA would too often "lose in the arbitration process what [they] earned the hard way at the bargaining table." *S.D. Warren,* 815 F.2d at 185.

■ However, the conclusion that Snow lacked authority to read the CBA in light of the Marijuana Act does not mean that the court believes Snow erred simply by looking to external law. Snow was within his authority to consider the Marijuana Act to the extent he did so to ensure the Act did not render any of the CBA provisions illegal. Not only does Article 21 of the CBA contemplate such an inqui-

ry, the Ninth Circuit has made it clear that CBA provisions should not be applied if they are illegal under state law. See *Cramer v. Consolidated Freightways, Inc.,* 255 F.3d 683, 695 (9th Cir.2001) ("Federal [labor] law does not grant the parties to collective-bargaining agreements the ability to contract for what is *illegal* under state law". (emphasis added)).

■ But whether a provision in the CBA is illegal is a very different question than the one the arbitrator posed here. The brunt of Snow's reasoning is that the parties wished for the CBA to "conform" with Oregon statutory provisions without regard for whether those provisions in fact rendered the CBA's drug policy illegal. In Snow's words: "the parties' agreement as well as the Employer's drug policy must be understood by reference to state law." See Arbitration Decision at 24. While arbitrators generally may consult external sources for guidance, see *Hawaii Teamsters,* 241 F.3d at 1184, the problem here is that the plain language of the CBA's provisions—specifically, the "under the influence" provisions—unambiguously resolve the issue presented. Indeed, as discussed, Snow himself found that Thomas was "under the influence," which, in turn, meant that Freightliner had the authority to terminate him. This is not a case in which the arbitrator found an ambiguity or gap in the CBA and thus looked to external law for meaning. Instead, Snow agreed that the drug-policy provisions were unambiguous, but he nevertheless went beyond those provisions to apply conflicting external law. In effect, Snow grafted the Marijuana Act's provisions onto the CBA. As discussed, however, Articles 5 and 21—the only internal authority Snow cited—are not plausibly read to give Snow such latitude in his interpretation of the CBA. In short, the court concludes that Snow "ignore[d] the plain language of the contract

and manifestly disregard[ed] the contours of the agreement." *Phoenix Newspapers,* 989 F.2d at 1081.

The court, however, acknowledges that at times Snow seemed to suggest that the Marijuana Act in fact did render the CBA's drug policy *illegal.* That is, some of Snow's language suggests he did not rely on the Act merely because of the parties' perceived intention to conform with or incorporate the Act, but because he believed the Act affirmatively invalidated the CBA provisions. See, e.g., Arbitration Decision at 23 ("it is reasonable to conclude that parties intend their agreement to be lawful.").[1] In any event, even accepting the proposition that Snow's decision found that the Marijuana Act rendered the CBA's drug policy illegal as applied to Thomas, Snow's decision still *does not stand.*

 As a threshold matter, the court accepts Teamsters' articulation of the governing standard for reviewing Snow's interpretation of the Marijuana Act: "manifest disregard of the law." See Teamsters' Memorandum at 16.[2] Showing a manifest disregard of the law involves a high burden; merely establishing that the arbitrator misinterpreted the law will not suffice. See *Todd Shipyards Corp. v. Cunard Line, Ltd.,* 943 F.2d 1056, 1060 (9th Cir.1991). Nevertheless, as the standard's

name suggests, the arbitrator cannot "recognize" but then "ignore" the law. *Michigan Mut. Ins. v. Unigard Security Ins. Co.,* 44 F.3d 826, 832 (9th Cir.1995). Moreover, the Ninth Circuit has observed that an arbitrator's decision is subject to challenge if the decision fairly can be said to be " 'completely irrational.' " *Todd Shipyards,* 943 F.2d at 1060 (quoting *French v. Merrill Lynch,* 784 F.2d 902, 906 (9th Cir. 1986)).

The only provision from the Marijuana Act Snow cited was the Act's workplace provision. That provision reads as follows: "nothing in [the Marijuana Act] shall be construed to require an employer to accommodate the medical use of marijuana in the workplace." ORS 475.340(2).

Again, Snow at times did suggest that the Act affirmatively made it illegal for Freightliner to regulate employees' use of marijuana. For instance, he reasoned: "What the law does not authorize is the right of an employer to discipline an employee who ingests medical marijuana on his or her own time based merely on the fact of ingestion." See Arbitration Decision at 25. Thus, Snow seemed to suggest, the Act permits parties to a CBA to regulate marijuana use only insofar as employers may forbid actually impaired employees from working. Snow, however,

---

1. The court again notes that Snow's decision is more reasonably read as concluding that the parties merely intended to conform to or incorporate the Marijuana Act's provisions. Indeed, Teamsters' briefing emphasizes that Snow did not find any of the CBA's provisions illegal:

 > Freightliner incorrectly states that the Arbitrator found the Oregon Medical Marijuana Act "superseded" the Labor Agreement and the drug policy. Rather, the Arbitrator interpreted the just cause and other explicit provisions of the Labor Agreement to mean that Freightliner is required to apply its drug policy *consistently with and with the consideration of Oregon law.*

 Teamsters' Brief at 11 (emphasis added). Thus, even Teamsters did not read Snow's decision as concluding that the Marijuana Act itself made any CBA provision illegal.

2. The court notes it is not determinatively deciding whether the "manifest disregard of the law" standard—which courts usually apply in commercial-arbitration disputes—should be generally applied to labor disputes. The court simply accepts Teamsters' application of that standard in this case. The court believes that however the standard should be specifically phrased, any decision by Snow that the Marijuana Act made the CBA provisions *illegal* cannot be upheld.

cited no statutory authority for the proposition the Act restricts how parties to a CBA may choose to treat marijuana use. Nor did Snow meaningfully link that proposition to the Act's workplace provision. Instead, he effectively applied his own notions of what the law should be, an approach tantamount to "ignoring" the law.

Even assuming Snow's articulation of what the law should be can be linked to an interpretation of the workplace provision, ORS 475.340(2), such an interpretation nevertheless would be a manifest disregard of the law and irrational. On its face, the Marijuana Act only aims to protect Oregon citizens holding valid marijuana prescriptions from criminal prosecution and prescribing doctors from civil penalties. ORS 475.300; ORS 475.319; ORS 475.326. Nothing in the Act even suggests that the Act was meant to limit private collective bargaining between employees and employers. Indeed, the only provision touching on employment issues is the workplace provision quoted above, which expressly protects employers from having to accommodate marijuana use. It is entirely irrational and qualifies as a manifest disregard of the law to assert that the workplace provision makes it *illegal* for parties to a CBA to negotiate how an employer may discipline marijuana use. See *Todd Shipyards*, 943 F.2d at 1060 (observing arbitration award may be overturned if it shows a "manifest disregard of law" or is "completely irrational"). Snow gave lip service to the workplace provision, thus arguably "recognizing" the law, but it is clear to the court that—to the extent he concluded that the provision made the CBA's drug policy illegal—he "ignored" the Act's manifestly limited reach. *Michigan Mut.*, 44 F.3d at 832. In effect, Snow at times seemed to construe the Marijuana Act—whose purpose is to provide an affir-

mative defense to certain criminal prosecutions—as itself affirmatively setting forth a penal provision applicable to employers. In sum, in light of the absence of a statutory genesis for any conclusion that the Marijuana Act made the CBA provisions at issue invalid, the court can only conclude that any such conclusion by Snow amounts to a manifest disregard the law.

## C. CBA's Prescription Drug Provision

In deciding whether Snow's decision failed to draw its essence from the CBA, there is one final issue to consider. In its briefing, Teamsters suggests that the CBA's prescription-drug provision provides support for Snow's decision. As mentioned, Snow determined that Thomas had a valid prescription for marijuana. The CBA contemplates prescription-drug use, providing in pertinent part:

> Employees who are required to take prescription drugs which may influence performance must report such drug usage to management for determination of work capability. Failure to do so will be cause for disciplinary action.

Teamsters contends this CBA provision is a circumstance which Snow properly considered in determining whether Thomas was subject to discipline for his positive drug screen.

The flaw in Teamsters' argument is that it is abundantly clear that Snow did not rely on the prescription-drug provision in reaching his conclusion. It is true Snow found that Thomas had a valid prescription and gave timely notice as required by the CBA; Snow's decision, however, was based entirely on the existence of the Marijuana Act, not any interplay between the prescription-drug provision and other drug-policy provisions.[3] Snow, for instance, re-

---

**3.** At oral argument, Teamsters' counsel conceded that the prescription-drug provision was not a "critical part" of Snow's analysis. See Tr. at 24–25.

peatedly emphasized that his decision rested on the finding that Thomas had "acted in accordance with a valid state law." See Arbitration Decision at 27. Indeed, in summarizing the gist of his ruling, Snow focused solely on the Act and its effect on his interpretation of the "under the influence" definition: *"Oregon law* amended the Company's definition of 'under the influence,' *and the definition understood against the backdrop of this law* means the Company failed to have just cause." *Id.* (emphasis added).

Had the arbitration decision been based on the prescription-drug provision, it is possible the court's analysis would be different. But, in this case, it would be purely speculative for the court to base its own decision on the prescription-drug language. Cf., e.g., *W.R. Grace & Co. v. Local Union 759, Int'l Union,* 461 U.S. 757, 767 n. 10, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) (noting that arbitrator *could have* considered an "impossibility" defense but he did not do so, thus making it inappropriate for the court to consider such a defense). The prescription-drug language suggests that Snow might have had good reasons for not relying on that language and instead relying solely on the effect of the Marijuana Act on the "under the influence" provisions. For instance, the prescription-drug language encompasses those prescriptions an employee is "required" to have. It is not clear what "required" means or that Thomas was "required" to take prescription marijuana.

Such issues are not the type of issues the court should resolve in the first instance. In addition, the prescription-drug policy gives Freightliner's management authority to determine an employee's "work capability," in light of whatever prescription drugs the employee is taking. Thus it is possible Snow did not rely on this provision because it suggests Freightliner would not have had to reinstate Thomas to his old position.

In summary, the court finds it would be inappropriate for it to rely on the prescription-drug provision when doing so presents some potentially fact-intensive issues and the arbitrator himself did not rely on that provision. Under these circumstances, Teamsters' arguments implicating the CBA's drug-prescription language serve only to divert attention from the core issue: whether the award itself represents a "plausible interpretation of the contract." *SFIC Props.,* 103 F.3d at 924–25. For the reasons discussed, the award, as set forth by Snow, does not represent a plausible interpretation of the CBA. As a result, the court is compelled to conclude Snow "dispensed his own brand of industrial justice by making an award that does not draw its essence from the collective bargaining agreement." *Hawaii Teamsters,* 241 F.3d at 1181.[4]

## III. CONCLUSION

For the reasons explained above, the court vacates the arbitrator's decision. Snow's decision did not draw its essence

4. The court notes that Thomas filed a "pleading to admit evidence." Specifically, Thomas proffers a CBA provision summarily mentioning Oregon's Medical Marijuana Act. The court declines to consider his proffer. First, Thomas was not a party to the arbitration, nor is he a party in this court. More important, the arbitrator did not consider Thomas's newly cited CBA provision because it was not presented at the arbitration. Thus it would not be appropriate for the court to consider Thomas's proffer of new evidence. See, e.g., *G.B. Goldman Paper Co. v. United Paperworkers,* 957 F.Supp. 607, 621 n. 10 (E.D.Pa.1997) (concluding court was "not permitted" to consider new evidence in reviewing arbitration award). It would be particularly improper to consider Thomas's new evidence here, since the parties expressly agreed that an April 1998 CBA was the relevant one and Thomas's new CBA language comes from a CBA with a different date.

from the CBA. Thus the court GRANTS Freightliner's motion for summary judgment (# 11), and DENIES Teamsters' motion (# 15).

IT IS SO ORDERED.